UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHANIE WASHINGTON | ) | CIVIL ACTION NO.: |
|    *-Plaintiff-* | ) | |
| | ) | |
| V. | ) | **3:20-cv-01111 (VLB)** |
| | ) | |
| DEVIN EATON, TERRANCE | ) | |
| POLLOCK, AZIZ ABDULLATTF, | ) | |
| CURT B. LENG, JOHN SULLIVAN, | ) | |
| TOWN OF HAMDEN, TOWN OF | ) | |
| HAMDEN POLICE DEPARTMENT, | ) | |
| RONNELL HIGGINS, YALE | ) | |
| UNIVERSITY, JUSTIN ELICKER, | ) | |
| OTONIEL REYES, CITY OF NEW | ) | |
| HAVEN, NEW HAVEN POLICE | ) | |
| DEPARTMENT, and T&S | ) | |
| UNITED, LLC | ) | |
|    *-Defendants-* | ) | **SEPTEMBER 28, 2020** |

## MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS (DKT. # 38)

Plaintiff respectfully files this memorandum in opposition to the motion to dismiss (doc. #34) filed by the defendants, Yale University, Ronnell Higgins, and Terrance Pollock. For the reasons set forth below, their motion should be denied.

### I.    STANDARD OF REVIEW

"The function of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof. (Internal quotations and citation omitted). Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc., 748 F.2d 774, 779 (2d Cir. 1984). When deciding a motion to dismiss, the Court must accept all well-

pleaded allegations as true and draw all reasonable inferences in favor of the pleader. <u>Hishon v. King</u>, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The complaint must contain the grounds upon which the claim rests through factual allegations sufficient " to raise a right to relief above the speculative level." <u>Bell A. Corp. v. Twombly</u>, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A plaintiff is obliged to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

"[D]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered" when ruling on a motion to dismiss. <u>Roth v. Jennings</u>, 489 F.3d 499, 509 (2d Cir. 2007). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted).

## II.    BACKGROUND

Stephanie Washington ("Ms. Washington") alleges that she was shot four (4) times on April 16, 2019 by police from the Town of Hamden and Yale University, as a direct and proximate consequence of the combined wrongful conduct of all of the defendants. Amended Complaint as a Matter of Course

("Amended Complaint"), First Count, ¶¶ 30-79.[1] More specifically, she alleges that she was shot while seated in the passenger seat of her car, which her companion, Paul Witherspoon, was driving, after they had been subjected to a traffic stop by defendants Eaton and Pollock. Amended Complaint, ¶¶ 55-61 & 80.f.-g.

Regarding her <u>Monell</u>[2] claim against these defendants, Ms. Washington alleges that the official policies spring from a Cross-Policing Agreement and Operational Guidelines, which are incorporated by reference into the Cross-Policing Agreement, between the City of New Haven and the Town of Hamden. Amended Complaint, First Count, ¶¶ 21-25. The Cross-Policing Agreement and Operational Guidelines grant police officers from the Town of Hamden the authority to engage in any action in the City of New Haven that the officer could engage in within the Town of Hamden with respect to non-emergency police enforcement activities, subject to the terms of the Cross-Policing Agreement and Operational Guidelines. Amended Complaint, First Count, ¶ 28.

The complaint further alleges that pursuant to the terms of the Cross-Policing Agreement and the Operational Guidelines, the defendants had a duty to implement policies, procedures, practices, and customs that furthered the goals stated in the agreements. Amended Complaint, Thirteenth Count, ¶ 82. One such

---

[1] Document #15, filed August 6, 2020.
[2] <u>Monell v. Department of Soc. Serv.</u>, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)

goal was to ensure that police officers from the Town of Hamden worked cooperatively with police officers for the City of Hew Haven when engaged in non-emergency police enforcement activities in the City of New Haven, instead of acting unilaterally. Amended Complaint, First Count, ¶ 29. The traffic stop of the vehicle that Stephanie Washington was in where she was shot by police did not involve an emergency situation (at least as a consequence of the conduct of either occupant in the vehicle being stopped). Amended Complaint, First Count, ¶ 80.a.(i)-(iv). Rather, Ms. Washington alleges that her being shot was directly and proximately caused by these defendants breaching their duty to implement policies, procedures, practices, and customs that furthered the goal of ensuring that the police officers from the Town of Hamden worked cooperatively with police officers from the City of New Haven, instead of acting unilaterally. Amended Complaint, Thirteenth Count, ¶¶ 82-85.

## III.   ARGUMENT

### A.   Plaintiff has alleged that Yale University and Ronnell Higgins allowed policies and customs to exist that directly and proximately caused her injuries.

A plaintiff may overcome a motion for judgment on the pleadings by asserting facts that, if proved, "establish municipal liability by showing that a municipal policy or custom existed as a result of the municipality's deliberate indifference to the violation of constitutional rights, either by inadequate training or supervision." Russo v. City of Hartford, 341 F.Supp.2d 85, 107 (D. Conn. 2004).

"A municipal policy may be pronounced or tacit and reflected in either action or inaction. In the latter respect, a city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." Cash v. County of Erie, 654 F.3d 324, 334 (2d Cir. 2011) (internal quotation marks and citations omitted). "[F]ailures to act – such as failures to train or supervise subordinates – may also evince municipal policy where municipal decisionmakers continue to adhere to an approach that they know or should know has failed to prevent constitutional violations." Davis v. City of New York, 75 Fed. Appx. 827, 829 (2d Cir. 2003) (internal quotations and citation omitted). "Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied." City of Canton v. Harris, 489 U.S. 378, 396 (1989) (O'Connor, concurring). "[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004) (internal quotation marks and citation omitted).

When asserting a Monell claim, a plaintiff must demonstrate that, "through its deliberate conduct, the municipality was the moving force behind the injury

alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." <u>Board of County Comm'rs v. Brown</u>, 520 U.S. 397, 404 (1997).

With respect to causation, claims brought under 42 U.S.C. § 1983 "'should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" <u>Malley v. Briggs</u>, 475 U.S. 335, 344, n.7, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (quoting <u>Monroe v. Pape</u>, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)). Traditional tort concepts of direct and proximate causation inform the causation inquiry on a § 1983 claim. <u>Powers v. Hamilton County Public Defender Com'n</u>, 501 F.3d 592, 608 (6th Cir. 2007).

The Second Circuit has framed the § 1983 proximate-cause question as a matter of foreseeability, asking whether it was reasonably foreseeable that the injuries complained of were a result of the defendant's conduct. Even if an intervening third party is the immediate trigger for the plaintiff's injury, the municipality may still be proximately liable, provided that the third party's actions were foreseeable. <u>Kerman v. City of New York</u>, 374 F.3d 93, 126-27 (2d Cir.2004) (holding that even where it was a hospital's doctors who decided to admit the plaintiff for psychiatric observation, the police officer who took the plaintiff to the hospital was nonetheless subject to liability under § 1983 because it was foreseeable that the plaintiff would be detained at the hospital as a result of the

officer's taking him there); <u>Warner v. Orange County Dept. of Probation</u>, 115 F.3d 1068, 1072-74 (2d Cir.1996) (holding that in recommending that the plaintiff be sentenced to an alcohol-treatment program that incorporated religious elements, a probation department could be held liable under § 1983 for violating the plaintiff's First Amendment rights, even though a judge made the sentencing decision). In short, defendants who are sued under § 1983, are '"'responsible for the natural consequences of [their] actions,'" <u>Warner</u>, 115 F.3d at 1071 (2d Cir. 1997) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 344 n. 7, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)) (other internal quotation marks omitted). Thus, "an actor may be held liable for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties." <u>Warner</u>, 115 F.3d at 1071 (internal quotation marks omitted).

In this case, Ms. Washington alleges she was shot because these defendants, Yale University and Ronnell Higgins:

a. allowed a policy, procedure, practice, and custom to exist where officers from Defendant HPD would act unilaterally when engaged in proactive law enforcement activities in New Haven;

b. failed to establish policies, procedures, practices and customs to ensure the proper coordination of activities and the proper supervision of their officers by officers from YPD or Defendant NHPD, when Defendant HPD officers were engaged in proactive law enforcement activities in New Haven;

c. failed to implement a proper training program to ensure their officers coordinated with and were supervised by officers from YPD or

Defendant NHPD, when Defendant HPD officers were engaged in proactive law enforcement activities in New Haven;

d.     failed to create and adopt policies, procedures, practices, and customs to define the circumstances when it was appropriate to enter New Haven for non-emergency proactive law enforcement activities;

e.     alternatively, if policies, procedures, practices, and customs exist that define when entering New Haven for non-emergency law enforcement activities was appropriate, failing to ensure that they were followed consistently;

f.     failed to establish a proper communications system and protocols to ensure that officers from different jurisdictions could easily and efficiently communicate with each other when engaged in proactive law enforcement activities together;

g.     alternatively, if such a communications system exists, failing to ensure that it was used in situations involving cross-jurisdictional policing activities.

With respect to the allegations against defendant Pollock, which can be

attributed to these policies, Ms. Washington alleges that defendant Pollock:

a.     failed to make any contact with either Defendant Hamden's Dispatch, Defendant New Haven's Dispatch, Defendant Yale's Dispatch or Defendant Eaton after seeing Defendant Eaton's vehicle pass his location, despite having enough time to do so;

b.     failed to scan or monitor Defendant New Haven's Dispatch or Defendant Hamden's Dispatch even though he was actively participating in the BOLO[3];

c.     failed to turn on his headlights or flashers even after seeing Defendant Eaton turn around, come back towards Defendant Pollock's cruiser, and then turn down Argyle Street;

---

[3] An acronym for "be on the look out for."

8

    **d.**    **as the senior officer on the scene from the local police force for Defendant New Haven, failed to assume control and supervision at the scene of this traffic stop involving Mr. Witherspoon, Ms. Washington and the red Honda Civic;**

    **e.**    **failed to make his presence known to Defendant Eaton at this traffic stop, which increased the likelihood of confusion and prevented coordination at the scene between him and Defendant Eaton, which failure was a substantial factor in causing the crossfire that occurred between Defendant Eaton and Defendant Pollock and the consequent injuries to Ms. Washington;**

**Amended Complaint, Fifth Count, ¶ 80.a.-e.**

Assuming these allegations are true, Ms. Washington has alleged a direct causal link between the policies, procedures, guidelines, and customs that have developed from the policies and customs adopted for purposes of implementing the Cross-Policing Agreement and Operational Guidelines. Had Yale University and Ronnell Higgins not been so lax in the manner in which they allowed police officers from the Town of Hamden to enter into New Haven to engage in cross-policing activities without coordination or communication with, or supervision from officers from Yale University, Defendant Pollock would not have taken such a laissez-faire approach to the presence of the shooter here, Officer Eaton, unilaterally engaging in police enforcement activity in the City of New Haven. In turn, Officer Pollock would have and should have proactively engaged Officer Eaton when he saw him and assumed supervisory control over the situation and the actions of Officer Eaton. Had Officer Pollock been proactive, there is little doubt that Stephaine Washington would not have been shot. Instead, the reason

Stephanie Washington was shot was as a direct and proximate result of the lassiez-faire attitude that Yale University and Ronnell Higgins allowed to exist within the Yale Police Department with respect to Hamden Police engaging in unilateral police enforcement activity within the City of New Haven. Stated differently, but for the defendants' policy of permitting Hamden police officers to travel into the City of New Haven and act unilaterally, including in situations such as the one here where their police officers should not have traveled to New Haven in the first place, Stephanie Washington would not have been shot.

The foreseeability requirement here is satisfied by the fact that Mr. Witherspoon was reported, albeit falsely, as possibly armed with a gun. Amended Complaint, First Count, ¶ 44. Aside from it being logically apparent to any reasonable person that police are more likely to employ deadly force in situations where suspects are reportedly armed with guns, there is also academic research that supports this logic, particularly in situations, such as we have in this case, where the suspect (Ms. Washington's companion, Mr. Witherspoon) is falsely reported by dispatch as being armed. Taylor, Paul L., "Dispatch Priming and the Police Decision to Use Deadly Force," 23 <u>Police Quarterly</u> 311-332 (Dec. 30, 2019) ("[T]his study examined the effects of dispatch priming on an officer's decision to use deadly force. The findings suggest that officers rely heavily on dispatched information in making the decision to pull the trigger when confronted with an ambiguously armed subject in a simulated environment. When the dispatched

information was erroneous, it contributed to a significant increase in shooting errors.")[4]

Therefore, in both sum and substance, Ms. Washington alleges that her injuries were directly and proximately caused by defendant Pollock following the official laissez-faire policies that existed or were permitted to exist, by:

a. failing to make any contact with either Defendant Hamden's Dispatch, Defendant New Haven's Dispatch, Defendant Yale's Dispatch or Defendant Eaton after seeing Defendant Eaton's vehicle pass his location, despite having enough time to do so;

b. failing to scan or monitor Defendant New Haven's Dispatch or Defendant Hamden's Dispatch even though he was actively participating in the BOLO;

c. failing to turn on his headlights or flashers even after seeing Defendant Eaton turn around, come back towards Defendant Pollock's cruiser, and then turn down Argyle Street;

d. as the senior officer on the scene from the local police force for Defendant New Haven, failing to assume control and supervision at the scene of this traffic stop involving Mr. Witherspoon, Ms. Washington and the red Honda Civic;

e. failing to make his presence known to Defendant Eaton at this traffic stop, which increased the likelihood of confusion and prevented coordination at the scene between him and Defendant Eaton, which failure was a substantial factor in causing the crossfire that occurred between Defendant Eaton and Defendant Pollock and the consequent injuries to Ms. Washington;

---

[4] The article may be found by copying and pasting the following link into a web browser: https://journals.sagepub.com/doi/10.1177/1098611119896653.

**11**

Had defendant Eaton's conduct not been consistent with these policies, it is entirely plausible that the plaintiff would not have been shot because:

    (i)    Defendant Eaton would not have been in the City of New Haven;

    (ii)    Even if defendant Eaton was properly in the City of New Haven, which is denied, he would not have acted unilaterally but for the policy of these defendants of allowing their officers to act unilaterally. Instead, defendant Eaton would have:

    (iii)    coordinated the initiation and execution of the traffic stop with defendant Pollock or some other officer from New Haven or Yale University, and

    (iv)    turned over supervision and control of the traffic stop to defendant Pollock or some other officer from New Haven or Yale University instead of initiating it on his own.

Therefore, the plaintiff has plausibly alleged that these defendants created policies that were the moving force in causing the plaintiff's injuries. Accordingly, the motion to dismiss the Thirteenth Count on this basis should be denied.

    B.    <u>The complaint alleges multiple acts of misconduct</u>.

Deliberate indifference is a question of fact for the jury. See <u>Davis v. Hall</u>, 375 F.3d 703, 719 (8th Cir.2004). Defendants argue that there are no "similar incidents" alleged. Consequently, the plaintiff has failed to allege deliberate indifference. However, an examination of the underlying allegations here demonstrate that plaintiff is not complaining of isolated events.

In paragraph 80.a. of count thirteen the practice of allowing officers from Hamden to act unilaterally when engaged in enforcement activity in New Haven

necessarily implies that this has happened multiple times. Similarly, the allegation in paragraphs 80.b-g. of count thirteen also fairly imply repeated conduct in failing to ensure proper communication and coordination with and supervision over Hamden police officers entering New Haven to engage in non-emergency police enforcement activities.

"A single police officer may grossly, outrageously, and recklessly misbehave in the course of a single incident. Such misbehavior may in a given case be fairly attributable to various municipal policies or customs, either those that authorized the police officer so to act or those that did not authorize but nonetheless were the 'moving force, <u>Polk County v. Dodson</u>, 454 U.S. 312, 326 (1981), or cause of the violation." <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 830-31 (1985). The policies and customs here of permitting unilateral action, failing to ensure there was proper communication and coordination between officers from Yale University and the Town of Hamden, and supervision of officers from the Town of Hamden by Yale University police when the two departments were engaged in cross-policing activities in New Haven is plausibly alleged to be the moving force in causing Stephanie Washington to be shot as discussed in Section A above. Accordingly, the motion to dismiss the Thirteenth Count on this basis should be denied.

C.    <u>Defendant Higgins was sued in his official not his individual capacity</u>.

Defendant Higgins argues that Ms. Washington's claim against him should be dismissed because Ms. Washington fails to allege a plausible claim for supervisory liability. In proffering this argument, defendants misconstrue the allegations against them. See <u>McGrath v. Scott</u>, 250 F. Supp.2d 1218, 1222-3 (D.Ariz. 2003) ("[M]unicipal and supervisory liability present distinct and separate questions that are treated and analyzed as such. . . . Supervisory liability concerns whether supervisory officials' own action or inaction subjected the Plaintiff to the deprivation of her federally protected rights. Generally, liability exists for supervisory officials if they personally participated in the wrongful conduct or breached a duty imposed by law. . .In contrast, municipal liability depends upon enforcement by individuals of a municipal policy, practice, or decision of a policymaker that causes the violation of the Plaintiffs federally protected rights. . . . Typically, claims asserted against supervisory officials in both their individual and official capacities provide bases for imposing both supervisory liability (the individual claim) and municipality liability (the official capacity claim) if the supervisor constitutes a policymaker.") (Citations omitted).

Ms. Washington sued defendant Higgins in his official capacity not his individual capacity. Amended Complaint, First Count, ¶ 12, n. 7. As such, her claim is brought against Chief Higgins for the policies and customs he and the others before him in their capacities as the Chiefs of Police for Yale University created under the Cross Policing Agreement and the Operational Guidelines,

**14**

dating back to the inception of these documents in 2011. See Amended

Complaint, First Count, ¶¶ 21-29 and Thirteenth Count, ¶¶ 82 & 83.

    To reiterate, the plaintiff's allegations here do not attempt to assign

supervisory liability against Chief Higgins in his individual capacity. Rather, the

plaintiff's claims are against Chief Higgins in his official capacity, because of the

policies and customs which he and/or his predecessors-in-interest create under

the auspices of the Cross-Policing Agreement and the Operational Guidelines.

Therefore, defendants' motion to dismiss the Thirteenth Count as to defendant

Higgins on this basis is misguided and should be denied.

        D.    <u>Section 1983 respondeat superior liability should extend to
Yale University as a private party</u>.

    The sound rationales for extending Section 1983 respondeat superior

liability to private parties were set forth in detail by the Seventh Circuit in <u>Shields

v. Illinois Dept. of Corrections</u>, 746 F.3d 782 (7th Cir. 2014).

    A close look at the reasoning of *Monell* provides no persuasive
reason to extend its holding to private corporations. *Monell* gave two
reasons for barring *respondeat superior* liability for municipalities under §
1983. First, the Court focused on the language of § 1983, which imposes
liability on a person who "shall subject, or cause to be subjected," any
person to a deprivation of Constitutional rights: The italicized language [of
causation] plainly imposes liability on a government that, under color of
some official policy, "causes" an employee to violate another's
constitutional rights. At the same time, that language cannot be easily read
to impose liability vicariously on governing bodies solely on the basis of
the existence of an employer-employee relationship with a tortfeasor.
Indeed, the fact that Congress did specifically provide that A's tort became
B's liability if B "caused" A to subject another to a tort suggests that

Congress did not intend § 1983 liability to attach where such causation was absent. 436 U.S. at 692.

Second, the Court concluded that the legislative history of the Civil Rights Act of 1871 showed that Congress did not intend to impose respondeat superior liability on municipalities. *Id.* at 693. The Court focused on a rejected proposal known as the Sherman Amendment. Directed at Ku Klux Klan activity in the Reconstruction-era South, the amendment would have held a municipality liable for the torts of private citizens not under the municipality's control, and thus would have imposed in essence a generalized duty to keep the peace. See 436 U.S. at 692-94 & n.57. The amendment was rejected largely due to concerns about its constitutionality. See *id.* at 678-79. The *Monell* Court seems to have concluded that if the 1871 Congress rejected the Sherman Amendment on constitutional grounds, then it similarly would have thought that respondeat superior liability for municipalities was unconstitutional, so respondeat superior liability for municipalities must be implicitly barred under § 1983. See *id.* at 693. While the Court's discussion is opaque, it was clearly focused on municipalities and did not consider private corporations, such as in *Adickes v. Kress*.[5]

The rejection of respondeat superior liability for municipalities in *Monell* has been the subject of extensive analysis and criticism. See *Board of the County Comm'rs v. Brown*, 520 U.S. 397, 430-37, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (Breyer, J., dissenting) (calling for reconsideration of *Monell* rejection of respondeat superior liability); *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 834-44, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (Stevens, J., dissenting) (same); see also, e.g., Jack M. Beermann, Municipal Responsibility for Constitutional Torts, 48 DePaul L. Rev. 627 (1999); Peter H. Schuck, Municipal Liability Under Section 1983: Some Lessons from Tort Law and Organization Theory, 77 Geo. L.J. 1753 (1989); Larry Kramer and Alan O. Sykes, Municipal Liability Under Section 1983: A Legal and Economic Analysis, 1987 S.Ct. Rev. 249 (1987); Susanah M. Mead, 42 U.S.C. § 1983 Municipal Liability: The *Monell* Sketch Becomes a Distorted Picture, 65 N.C. L. Rev. 517 (1987); Karen M. Blum, From *Monroe to Monell*: Defining the Scope of Municipal Liability in Federal Courts, 51 Temple L.Q. 409 (1978). (A reader of these critiques will find citations to many more.) These commentators have pointed out many critical problems with *Monell* 's

---

[5] <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

conclusion that *respondeat superior* claims against municipalities are not permitted under § 1983.

Perhaps the most important criticism to emerge from this literature is that *Monell* failed to grapple with the fact that *respondeat superior* liability for employers was a settled feature of American law that was familiar to Congress in 1871, when § 1983 was enacted. Congress therefore enacted § 1983 against the backdrop of *respondeat superior* liability, and presumably assumed that courts would apply it in claims against corporations under § 1983. Cf. *Smith v. Wade*, 461 U.S. 30, 38-45, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983) (considering common law in 1871 to decide standard for punitive damages under § 1983); *Carey v. Piphus*, 435 U.S. 247, 257-59, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978) (considering common law in 1871 to decide that actual injury is needed to recover compensatory damages under § 1983); see generally Jack M. Beermann, A Critical Approach to Section 1983 With Special Attention to Sources of Law, 42 Stanford L. Rev. 51, 66-73 (1989).

The Court's reliance on the Sherman Amendment is also problematic. The rejection of the proposal to hold municipalities liable for actions of private citizens it could not control says little about whether a municipality should be held liable for constitutional torts committed by its own employees acting within the scope of their employment. … Finally, the Court gave only cursory and tentative treatment to the strongest foundation for *respondeat superior* liability: an employer should be held responsible for the torts of employees whose actions it can control and from whose actions it profits. See 436 U.S. at 694 & n.58.

Given these flaws on the surface of its reasoning, *Monell* is probably best understood as simply having crafted a compromise rule that protected the budgets of local governments from automatic liability for their employees' wrongs, driven by a concern about public budgets and the potential extent of taxpayer liability.

Of course, the critiques of *Monell* 's rejection of *respondeat superior* liability for municipalities have not yet persuaded the Supreme Court to reconsider that rule. Given our position in the judicial hierarchy, then, we are bound to follow Monell as far as municipal liability is concerned. We need not extend that holding, however, to the quite different context of private corporate defendants.

17

As noted, *respondeat superior* liability, which makes employers liable for their employees' actions within the scope of their employment, is an old and well-settled feature of American law. See, e.g., Restatement (3d) of Agency § 2.04 (2006); Kerl v. Dennis Rasmussen, Inc., 2004 WI 86, 273 Wis.2d 106, 682 N.W.2d 328, 334 (Wis. 2004) (Sykes, J.) (*respondeat superior* "has been well-settled in the law of agency for perhaps as long as 250 years." ); *Sword v. NKC Hospitals, Inc.*, 714 N.E.2d 142, 147-48 (Ind. 1999); *Adames v. Sheahan*, 233 Ill.2d 276, 909 N.E.2d 742, 754-55, 330 Ill. Dec. 720 (Ill. 2009). It is often justified through a deterrence theory. E.g., *Kerl*, 682 N.W.2d at 336. Employers are less likely than employees to be judgment-proof and thus are more likely to be deterred by potential liability. *Id.* Plus, while potential liability for a single tort may not be enough to cause an employee to take more care, the specter of massive aggregate liability might spur the employer to take precautions. Employers are in the better position to take cost-effective measures to avoid causing injury and can absorb the costs of those precautions more easily than their individual employees. *Id.* All of this suggests that making employers liable for their employees' torts may result in less tortious behavior overall. We should not insulate employers from *respondeat superior* liability under § 1983 without powerful reasons to do so.

The text of § 1983 does not foreclose *respondeat superior* liability for corporations. "Cause" has many legal meanings, but it generally refers to proximate causation, which is something broader than immediate, direct causation. See *National Union Fire Ins. Co. v. Mead Johnson & Co., LLC*, 735 F.3d 539, 547 (7th Cir. 2013); *United States v. Laraneta*, 700 F.3d 983, 990 (7th Cir. 2012). The requirement of causation certainly does not generally preclude respondeat superior liability for a given tort. See Dobbs' Law of Torts § 425 (2d ed); *Kerl*, 682 N.W.2d at 334; *Sword*, 714 N.E.2d at 147-48; *Adames*, 909 N.E.2d at 754-55. The causation requirement affects whether an individual employee can be found liable for a wrong in the first place, not whether his or her wrong can be imputed to the employer under *respondeat superior*. Courts routinely applying *respondeat superior* liability to corporations do not ask whether the corporation " caused" the wrong by its employee. They ask instead only whether the employee was acting within the scope of employment.

The *Monell* Court's interpretation of the legislative history of the Civil Rights Act of 1871 similarly does not indicate that Congress rejected the idea of *respondeat superior* liability for corporations. The rejected Sherman Amendment, which the *Monell* Court relied on to reject respondeat superior

18

liability for municipalities, would have made a "county, city, or parish" vicariously liable for acts of violence committed by private citizens. *Monell*, 436 U.S. at 667. The amendment was designed to make municipalities vicariously liable for violence and property damage inflicted by the Ku Klux Klan, regardless of whether the municipality knew of the Klan's planned activity in advance or had the power to stop it. *Id.* at 667-68. That proposition simply is not analogous to imposing liability on private corporations for the tortious behavior of their own employees acting within the scope of employment. Nothing in the *Monell* treatment of the legislative history bars *respondeat superior* liability for corporations.

Other Supreme Court decisions also do not require the extension of *Monell* to this new context. *Monell* itself said nothing about whether its new "policy or custom" standard would apply to private companies sued under § 1983. Nor did *Monell* even mention *Adickes'* almost reflexive application of respondeat superior liability to a private company under § 1983. *Adickes* remains good law, see *Lugar*, 457 U.S. at 930-31 (quoting *Adickes'* discussion of private liability under § 1983 at length and with approval), so current Supreme Court precedent seems to support rather than reject *respondeat superior* liability for private corporations under § 1983. Further, since *Monell*, the Supreme Court has never held that a private corporation may take advantage of the *Monell* standard that applies to local governments. That suggests that we should treat a private corporation like any other "person" who causes a constitutional violation and that respondeat superior liability should apply.

Moreover, in the related context of qualified immunity under § 1983, the Court has distinguished between employees of municipalities and employees of private corporations. In both *Richardson v. McKnight*, 521 U.S. 399, 412, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997), and *Wyatt v. Cole*, 504 U.S. 158, 167-68, 112 S.Ct. 1827, 118 L.Ed.2d 504 (1992), the Supreme Court based its conclusion on grounds of both history and policy, focusing on differences between private actors and governments. Despite a long history of private corporations performing state functions, there is no tradition of providing immunity to their employees. *Richardson*, 521 U.S. at 405.

Further, unlike municipalities, private corporations are subject to market pressures, which provide a set of incentives entirely different from those imposed by the democratic process. *Id.* at 409-11. The conditions under which private corporations compete and provide government

> services are thus materially different from those affecting municipalities. *Id.*
> Due to these differences, private prison employees are barred from
> asserting qualified immunity from suit under § 1983. *Id.* at 412.

<u>Shields</u>, 746 F.3d 790-94 (7th Cir. 2014). The cases cited by the defendant, <u>Rojas v.
Alexander's Dep't Store, Inc.</u>, 924 F.2d 406 (2d Cir. 1990), and <u>Wells v. Yale Univ.</u>,
2011 U.S. Dist. LEXIS 82453 (D. Conn. July 28, 2011) (Droney, J.), do not appear to
have considered any of these points.  Accordingly, based on the rationale of the
Seventh Circuit as set forth in <u>Shields</u> as quoted above, the undersigned
respectfully submits that there is good cause to extend respondeat superior
liability to Yale University, and the motion to dismiss the Seventh Count should
be denied.

  E. <u>Yale University is engaged in the municipal function of policing</u>.

  Defendants argue that Yale University is not a town, city or borough.
Therefore, it has no duty to indemnify Officer Pollock under General Statutes § 7-
465. Yet, it is undisputed that Yale University's police have all of the same powers
as the police for the City of New Haven pursuant to Section 3 of Public Act 83-
466. Consequently, for purposes of the operation of Yale University's police
department, it is part of the City of New Haven. Accordingly, the defendants'
motion to dismiss the Eighth Count should be denied.

## IV. CONCLUSION

For the foregoing reasons, the undersigned respectfully submits that the defendant's motion to dismiss counts seven, eight, and thirteen of the Amended Complaint should be denied.

THE PLAINTIFF,

BY:   /s/ John-Henry M. Steele (ct10187)
John-Henry M. Steele, Esq.
DEY SMITH STEELE, LLC
9 Depot Street, 2nd Floor
Milford, CT 06460
Tel.: (203) 882-3351
Fax: (203) 882-3359
E-mail: jhs@deysmith.com

## CERTIFICATION

I hereby certify that on Monday, September 28, 2020, a copy of the foregoing was filed electronically and served by U.S. Mail, postage prepaid, on anyone unable to access, use or accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ John-Henry M. Steele (ct10187)