## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| STEPHANIE WASHINGTON | ) | CIVIL ACTION NO.: |
|    *-Plaintiff-* | ) | |
| | ) | |
| V. | ) | 3:20-cv-01111 (VLB) |
| | ) | |
| DEVIN EATON, TERRANCE | ) | |
| POLLOCK, AZIZ ABDULLATTF, | ) | |
| CURT B. LENG, JOHN SULLIVAN, | ) | |
| TOWN OF HAMDEN, TOWN OF | ) | |
| HAMDEN POLICE DEPARTMENT, | ) | |
| RONNELL HIGGINS, YALE | ) | |
| UNIVERSITY, JUSTIN ELICKER, | ) | |
| OTONIEL REYES, CITY OF NEW | ) | |
| HAVEN, NEW HAVEN POLICE | ) | |
| DEPARTMENT, and T&S | ) | |
| UNITED, LLC | ) | |
|    *-Defendants-* | ) | OCTOBER 22, 2020 |

### MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS (DOC. # 39)

Plaintiff respectfully files this memorandum in opposition to the motion to dismiss (doc. #39) filed by the defendants, Justin Elicker, Otoniel Reyes, City of New Haven, and New Haven Police Department, and their memorandum in support (doc #40).

### I.    STANDARD OF REVIEW

"The function of a motion to dismiss is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof. (Internal quotations and citation omitted). <u>Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.</u>, 748 F.2d 774, 779

(2d Cir. 1984). When deciding a motion to dismiss, the Court must accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the pleader. <u>Hishon v. King</u>, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984). The complaint must contain the grounds upon which the claim rests through factual allegations sufficient " to raise a right to relief above the speculative level." <u>Bell A. Corp. v. Twombly</u>, 550 U.S. 544, 556, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A plaintiff is obliged to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim plausible. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009).

"[D]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered" when ruling on a motion to dismiss. <u>Roth v. Jennings</u>, 489 F.3d 499, 509 (2d Cir. 2007). "Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." <u>Chambers v. Time Warner, Inc.</u>, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted).

## II.   BACKGROUND

Stephanie Washington ("Ms. Washington") alleges that she was shot four (4) times on April 16, 2019 by police from the Town of Hamden and Yale University, as a direct and proximate consequence of the combined wrongful conduct of all of the defendants. Amended Complaint as a Matter of Course

2

("Amended Complaint"), First Count, ¶¶ 30-79.[1] More specifically, she alleges that she was shot while seated in the passenger seat of her car, which her companion, Paul Witherspoon, was driving, after they had been subjected to a traffic stop by defendants Eaton and Pollock. Amended Complaint, ¶¶ 55-61 & 80.f.-g.

Regarding her Monell[2] claim against these defendants, Ms. Washington alleges that the official policies spring from a Cross-Policing Agreement and Operational Guidelines, which are incorporated by reference into the Cross-Policing Agreement, between the City of New Haven and the Town of Hamden. Amended Complaint, First Count, ¶¶ 21-25. The Cross-Policing Agreement and Operational Guidelines grant police officers from the Town of Hamden the authority to engage in any action in the City of New Haven that the officer could engage in within the Town of Hamden with respect to non-emergency police enforcement activities, subject to the terms of the Cross-Policing Agreement and Operational Guidelines. Amended Complaint, First Count, ¶ 28.

The complaint further alleges that pursuant to the terms of the Cross-Policing Agreement and the Operational Guidelines, the defendants had a duty to implement policies, procedures, practices, and customs that furthered the goals stated in the agreements. Amended Complaint, Fourteenth Count, ¶ 82. One such

---

[1] Document #15, filed August 6, 2020.
[2] Monell v. Department of Soc. Serv., 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)

goal was to ensure that police officers from the Town of Hamden worked cooperatively with police officers for the City of Hew Haven when engaged in non-emergency police enforcement activities in the City of New Haven, instead of acting unilaterally. Amended Complaint, First Count, ¶ 29. The traffic stop of the vehicle that Stephanie Washington was in where she was shot by police did not involve an emergency situation (at least as a consequence of the conduct of either occupant in the vehicle being stopped). Amended Complaint, First Count, ¶ 80.a.(i)-(iv). Though it devolved into one because of the combined conduct of all of the defendants in this lawsuit. Rather, Ms. Washington alleges that her being shot was directly and proximately caused by these defendants breaching their duty to implement policies, procedures, practices, and customs that furthered the goal of ensuring that the police officers from the Town of Hamden worked cooperatively with police officers from the City of New Haven, instead of acting unilaterally. Amended Complaint, Fourteenth Count, ¶¶ 82-85.

   III.   ARGUMENT

       A.   Indemnity under C.G.S. § 7-465.

   Contrary to defendants' assertions at p. 14 of their Memorandum in Support of Motion to Dismiss (doc. #40), is not all patently clear that pursuant to Section 3 of Public Act 83-466 that Officer Pollock was an employee of Yale University for all purposes. Indeed, the phrase "for all purposes" is modified by the trailing clause, which states: "subject to the terms and conditions as may be

**4**

mutually agreed upon by the city of New Haven, acting through the board of police commissioners, and Yale University."[3] Defendants do not inform us as to what the additional terms and conditions are that were agreed to between Yale University and the Board of Police Commissioners for the City of New Haven. Indeed, under General Statutes § 7-276, the "sole power of appointment, promotion and removal of officers and members of" the police department for the City of New Haven would appear to lie with the Board of Police Commissioners for the City of New Haven, and not Yale University. Conn. Gen. Stat. § 7-276. This alone would appear to be sufficient reason to deny the defendants' motion to dismiss the Ninth Count of the Amended Complaint.

Nevertheless, on or about September 29, 1992, Yale University and the Board of Police Commissioners for the City of New Haven entered into a Memorandum of Understanding ("MOU"), which was not provided by the defendants as part of their motion or memorandum. A copy of the MOU is appended as Exhibit A. Pursuant to that MOU, pg. 1, paragraph 3:

---

[3] The full text of Section 3, Public Act 83-466 states: "The city of New Haven, acting through its board of police commissioners, may appoint persons designated by Yale University to act as Yale University police officers. Such officers having duly qualified under section 7-294d of the general statutes, and having been sworn, shall have all the powers conferred upon municipal police officers for the city of New Haven. They shall be deemed for all purposes to be agents and employees of Yale University, subject to such conditions as may be mutually agreed upon by the city of New Haven, acting through its board of police commissioners, and Yale University.

3.      In all matters of promotion, termination, discipline and employment, personnel policies and procedures established by the University shall apply to Yale University Police Officers and shall be administered solely by the University. Such officers shall be deemed for all purposes to be agents and employees of the University and shall be paid for their services, including while in emergency service for the City of New Haven, and receive any benefits to which they are entitled by law, from the University.

Based on this language, on September 30, 2020 at 8:18 AM, the

undersigned sent an e-mail to Michael Wolak, Esq., counsel for the instant

defendants, stating:

Good morning, Michael.

If you can confirm for me by written representation in reply to this e-mail that the terms of the attached Memorandum of Understanding between Yale University and the Board of Police Commissioners for the City of New Haven, dated September 29, 1992, was in full force and effect on April 16, 2019, I will indicate in my memorandum in opposition to your motion to dismiss that I have no objection to the Court entering an order dismissing the Ninth Count against the City of New Haven.

Sincerely,
John-Henry M. Steele, Esq.
Dey Smith Steele, LLC
9 Depot Street, 2nd Floor
Milford, CT 06460
Tel: 203.882.3351
Fax: 203.882.3359
Email: jhs@deysmith.com
Cell: 860.655.1860

The Memorandum of Understanding attached to this e-mail is identical to the one

appended hereto as Exhibit A. At 10:10 AM, Attorney Wolak responded as

follows:

**6**

Hi John-Henry,

I just had a telephone conversation with the Chair of the Board of Police Commissioners, Anthony Dawson, and he confirmed that the Memorandum of Understanding between Yale University and the Board of Police Commissioners for the City of New Haven, dated September 29, 1992, is renewed on a yearly basis, so it would have been in effect on April 16, 2019.

Mike

A copy of the original e-mail and Attorney Wolak's reply is appended hereto as Exhibit B.

Accordingly, based on the foregoing, the undersigned has no objection to the Court entering an order dismissing the Ninth Count of the Amended Complaint seeking that the City of New Haven indemnify defendant Pollock for his conduct in directly and proximately causing the plaintiff's injuries. Having stated this, nothing herein is inconsistent with the plaintiff's claim that Yale University must indemnify defendant Pollock under General Statutes § 7-465, since Yale University is engaging in the municipal function of policing to the same extent as the City of New Haven pursuant to Section 3 of Public Act 83-466.

B.     **The New Haven Police Department is plausibly alleged to be a separate entity capable of being sued.**

Defendants' argument here is that the Charter for the City of New Haven does not provide for the separate existence of the Police Department for the city of New Haven. Consequently, the Police Department for the City of New Haven is not a separate entity capable of being sued. Defendant's Memorandum (doc. # 40)

at pp. 15-19. However, Connecticut General Statutes § 7-193(b) states in relevant part: "… Any municipality may, by charter or by ordinances or resolutions adopted pursuant to such charter, alter the method of … organization of any or all … departments, boards, commissions or agencies, including combining or separating the duties of each, unless specifically prohibited from making such alteration by the Constitution or the general statutes."

Accepting plaintiff's allegations as true, the plaintiff has plausibly alleged that the New Haven Police Department is a separate legal entity capable of suing and being sued. Boards of police commissioners, though existing under the broader corporate structure of the municipalities that they serve, are separate entities who can sue or be sued. See, e.g. Clisham v. Board of Police Commissioners, 223 Conn. 354 (1992)[4]; Sanzone v. Board of Police Commissioners, 219 Conn. 179 (1991)[5]; Board of Police Commissioners v. White, 171 Conn. 553 (1976)[6]; see also United Public Service Employees Union, COPS Local 062 v. Town of Hamden, et al., Dkt. # NNH-CV19-5047513-S, a civil action currently pending on the docket of both the Superior Court and the Appellate

---

[4] A case involving the Board of Police Commissioners for the Borough of Naugatuck.
[5] A case involving the Board of Police Commissioners for the City of Bridgeport.
[6] A case involving the Board of Police Commissioners for the City of New Haven.

8

Court, where one of the named defendants is on the Town of Hamden's Board of Police Commissioners.[7]

By statute, the management and supervision of police departments fall under the auspices of these separate boards, including the "sole power of appointment, promotion and removal of officers and members of such police department[.]" Conn. Gen. Stat. § 7-276. Similarly, there are several cases currently pending on the Superior Court's docket where a municipal police department is the named plaintiff.[8] Employing a "party name" search on the Superior Court's website using the term "police department" in the field entitled "Party Last Name" produces a number of other cases where police departments are also named as defendants or have appeared as third parties. Consequently, the existence of the New Haven Police Department as an entity with a separate

---

[7] Please see, http://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=NNHCV195047513S. In this case the plaintiff sought and received an order enjoining the Board of Police Commissioners for the Town of Hamden from proceeding with disciplinary hearings against the defendant here, Devin Eaton, for shooting the plaintiff, Stephanie Washington. The Town of Hamden filed an appeal acknowledging that the Board of Police Commissioners for the Town of Hamden was a separate party to the action. See docket entry # 106.00, filed 12/24/2019 at p. 2.

[8] Please see, Police Department, Town of Stratford v. Board of Firearms Permit Examiners, dkt. # HHB-CV19-6052640-S, http://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=HHBCV196052640S; Police Department of the Town of Darien v. Freedom of Information Commission, dkt. # HHB-CV18-6042717-S, http://civilinquiry.jud.ct.gov/CaseDetail/PublicCaseDetail.aspx?DocketNo=HHBCV186042717S; and

legal identity from the City of New Haven is entirely plausible. Therefore, the motion to dismiss on this basis should be denied.

C.  **Plaintiff has alleged that the City of New Haven, Justin Elicker, and Otoniel Reyes, allowed policies and customs to exist that directly and proximately caused her injuries.[9]**

"A municipal policy may be pronounced or tacit and reflected in either action or inaction. In the latter respect, a city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." <u>Cash v. County of Erie</u>, 654 F.3d 324, 334 (2d Cir. 2011) (internal quotation marks and citations omitted). "[F]ailures to act – such as failures to train or supervise subordinates – may also evince municipal policy where municipal decisionmakers continue to adhere to an approach that they know or should know has failed to prevent constitutional violations." <u>Davis v. City of New York</u>, 75 Fed. Appx. 827, 829 (2d Cir. 2003) (internal quotations and citation omitted). "Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied." <u>City of Canton v. Harris</u>, 489 U.S. 378, 396 (1989) (O'Connor, concurring).

---

[9] This section applies with equal force to all of the various municipal defendants' motions claiming that the plaintiff has failed to state a proper <u>Monell</u> claim for relief under 42 U.S.C. § 1983.

Similarly, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d Cir. 2004) (internal quotation marks and citation omitted).

Even a constitutional policy or custom may be actionable under 42 U.S.C. § 1983. City of Canton v. Harris, 489 U.S. 378, 387, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "Where plaintiffs allege that their rights were deprived not as a result of the enforcement of an unconstitutional official policy or ordinance, but by the unconstitutional application of a valid policy, ... the inquiry focuses on whether the actions of the employee in question may be said to represent the conscious choices of the municipality itself." Amnesty America v. Town of West Hartford, 361 F.3d 113, 126 (2d Cir.2004).

To satisfy Monell, an injured plaintiff must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy. See Bennett v. City of Slidell, 728 F.2d 762, 767 (5th Cir. 1984) (en banc), cert denied, 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985). When asserting a Monell claim, a plaintiff must demonstrate that, "through its deliberate conduct, the municipality was the moving force behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the

requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Board of County Comm'rs v. Brown, 520 U.S. 397, 404 (1997).

As this Court noted in Miron v. Town of Stratford, 881 F.Supp.2d 280, 284-85 (2012):

> In order for a municipality to be held liable under § 1983, a plaintiff must show that the "municipality violated a federal right through (1) municipal policy, (2) municipal custom or practice, or (3) the decision of a municipal policymaker with final policymaking authority." Zherka v. DiFiore, 412 Fed. Appx. 345, 348 (2d Cir.2011) (relying on Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). It is not sufficient to allege conduct attributable to the municipality, the plaintiff must demonstrate that, "through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." Id. (citing Bd. of County Comm'rs v. Brown, 520 U.S. 397, 405, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997)) (internal quotations omitted) (emphasis in original).

> The Plaintiff does not allege directly that the existence of a policy, custom, practice or decision by a final policymaker caused the defendant officers' conduct. Instead, he relies on a theory of inaction and deliberate indifference. "[W]here a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 126 (2d Cir.2004) (internal quotations omitted) (quoting City of Canton v. Harris, 489 U.S. 378, 396, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (holding Monell liability is established if a city is put on notice that a particular omission will result in a deprivation of constitutional rights and deliberately chooses not to act).

Consequently, the plaintiff can pursue a claim if the policy was the moving force behind the alleged injury. The plaintiff can also pursue a claim if a policymaking official exhibits deliberate indifference or deliberately chooses not

12

to act having been put on notice that the failure to act will result in a deprivation of constitutional rights.

### 1.      Municipal policy.

The allegations in the complaint leave no question as to what policy is at issue in this case. Amended Complaint, First Count, ¶¶ 21-25, which state:

> 21.     At all times relevant to the claims herein, a cross-policing agreement was in force between Defendant New Haven and Defendant Hamden entitled, "TOWN OF HAMDEN AND THE CITY OF NEW HAVEN NON-EMERGENCY INTERAGENCY AGREEMENT" (the "Cross-Policing Agreement"), which was signed by John DeStefano, Jr., Mayor of Defendant New Haven on March 11, 2011, and Scott Jackson, Mayor of the Defendant Hamden on March 9, 2011.

> 22.     Incorporated by reference into the terms of the Cross-Policing Agreement are the terms of the Non-Emergency Interagency Agreement Between Hamden and New Haven Operational Guidelines (the "Operational Guidelines").

> 23.     The Operational Guidelines were signed by Frank Limon, Police Chief, City of New Haven on January 31, 2011, and by Thomas Wydra, Police Chief, Town of Hamden on March 9, 2011.

> 24.     Prior to signing of the Cross-Policing Agreement and the Operational Guidelines, the terms of same were approved by Defendant Hamden and Defendant New Haven in the same manner as ordinances are approved by each municipal corporation.

> 25.     Accordingly, the Cross-Policing Agreement and the Operational Guidelines, which were authorized by statute and voluntarily entered into by Defendant New Haven and Defendant Hamden, were binding upon and consequently an official policy of Defendant New Haven, Defendant NHPD, Defendant Hamden, and Defendant HPD.

2.    **Municipal custom**.

The allegations of custom concern the manner in which the Cross-Policing

Agreement and Operational Guidelines were implemented in practice,

specifically, the allegations in the Amended Complaint, Fourteenth Count,

subparagraphs a.-g. in paragraph 83:

a.    allowing a policy, procedure, practice, and custom to develop and exist where officers from Defendant HPD would act unilaterally when engaged in proactive law enforcement activities in New Haven;

b.    failing to establish policies, procedures, practices, and customs to ensure the proper coordination and supervision of Defendant HPD's officers by officers from YPD or Defendant NHPD, when Defendant HPD's officers were engaged in proactive law enforcement activities in New Haven;

c.    failing to implement a proper training program to ensure their officers coordinated with and supervised officers from Defendant HPD, when officers from Defendant HPD were engaged in proactive law enforcement activities in New Haven;

d.    failing to adopt policies, procedures, practices, and customs, to define when entering New Haven for non-emergency law enforcement activities was appropriate;

e.    alternatively, if policies, procedures, practices, and customs exist that define when entering New Haven for non-emergency law enforcement activities was appropriate, failing to ensure that they were followed consistently;

f.    failing to establish a proper communications system and protocols to ensure that officers from different jurisdictions could easily and efficiently communicate with each other when engaged in proactive law enforcement activities together;

g.    alternatively, if such a communications system exists, failing to ensure that it was consistently used in situations involving police

engaged in proactive law enforcement activities in another police department's jurisdiction.

### 3.    Moving force.

Claims brought under 42 U.S.C. § 1983 should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'" <u>Malley v. Briggs</u>, 475 U.S. 335, 344, n.7, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (quoting <u>Monroe v. Pape</u>, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961)). Traditional tort concepts of direct and proximate causation inform the causation inquiry on a § 1983 claim. <u>Powers v. Hamilton County Public Defender Com'n</u>, 501 F.3d 592, 608 (6th Cir. 2007). "A single police officer may grossly, outrageously, and recklessly misbehave in the course of a single incident. Such misbehavior may in a given case be fairly attributable to various municipal policies or customs, either those that authorized the police officer so to act or those that did not authorize but nonetheless were the 'moving force, <u>Polk County v. Dodson</u>, 454 U.S. 312, 326 (1981), or cause of the violation." <u>City of Oklahoma City v. Tuttle</u>, 471 U.S. 808, 830-31 (1985).

With respect to the allegations against defendant Pollock, which can be attributed to these policies and customs, Ms. Washington alleges that defendant Pollock:

a.    failed to make any contact with either Defendant Hamden's Dispatch, Defendant New Haven's Dispatch, Defendant Yale's Dispatch or Defendant Eaton after seeing Defendant Eaton's vehicle pass his location, despite having enough time to do so;

    b.      failed to scan or monitor Defendant New Haven's Dispatch or Defendant Hamden's Dispatch even though he was actively participating in the BOLO[10];

    c.      failed to turn on his headlights or flashers even after seeing Defendant Eaton turn around, come back towards Defendant Pollock's cruiser, and then turn down Argyle Street;

    d.      as the senior officer on the scene from the local police force for Defendant New Haven, failed to assume control and supervision at the scene of this traffic stop involving Mr. Witherspoon, Ms. Washington and the red Honda Civic;

    e.      failed to make his presence known to Defendant Eaton at this traffic stop, which increased the likelihood of confusion and prevented coordination at the scene between him and Defendant Eaton, which failure was a substantial factor in causing the crossfire that occurred between Defendant Eaton and Defendant Pollock and the consequent injuries to Ms. Washington;

Amended Complaint, Fifth Count, ¶ 80.a.-e. As such, on April 16, 2019, it is plausible to infer that defendant Pollock was acting according to municipal policy and customs established by the City of New Haven with respect to coordinating and communicating with officers from the Town of Hamden who were engaged in enforcement activities within the City of New Haven.

        Assuming these allegations are true, Ms. Washington has alleged a direct causal link between the policies and customs adopted for purposes of implementing the Cross-Policing Agreement and Operational Guidelines. Had the City of New Haven and its Mayors and Chiefs of Police not been so lax in the

---

[10] An acronym for "be on the look out for."

manner in which they allowed police officers from the Town of Hamden to enter into New Haven to engage in cross-policing activities without coordination or communication with, or supervision from, officers from the City of New Haven, including those employed by Yale University, defendant Pollock would not have taken such a laissez-faire approach to the presence of the shooter here, Officer Eaton, unilaterally engaging in police enforcement activity in the City of New Haven. Fiacco v. City of Rensselaer, 783 F.2d 319, 327 (2d Cir.1986), cert. denied, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 698 (1987) (municipality "should not take a laissez-faire attitude toward the violation by its peace officers of the very rights they are supposed to prevent others from violating"). Instead, Officer Pollock would have and should have proactively engaged Officer Eaton when he saw him and assumed supervisory control over the situation and the actions of Officer Eaton. See Declaration of Jamie Gallagher, appended hereto as Exhibit C, ¶¶ 10. Had Officer Pollock been proactive, it is entirely plausible that Stephanie Washington would not have been shot but for this laissez-faire approach to the actions of defendant Eaton. Instead, the reason Stephanie Washington was shot was as a direct and proximate result of defendant Pollock following the laissez-faire practices and customs that the City of New Haven and its Mayors and Chiefs of Police implemented with respect to Hamden Police engaging in police enforcement activity within the City of New Haven. Stated differently, but for the defendants' policy and custom of permitting Hamden police officers to travel into

**17**

the City of New Haven and act unilaterally, including in situations such as the one here where the police officer from the Town of Hamden should not have traveled to New Haven in the first place, Stephanie Washington would not have been shot. Similarly, but for the laissez-faire approach to communicating and coordinating with officers from the Town of Hamden who are engaged in police enforcement activity in the City of New Haven, Stephanie Washington would not have been shot.

The Second Circuit has framed the § 1983 proximate-cause question as a matter of foreseeability, asking whether it was reasonably foreseeable that the injuries complained of were a result of the defendant's conduct. Even if an intervening third party is the immediate trigger for the plaintiff's injury, the municipality may still be proximately liable, provided that the third party's actions were foreseeable. Kerman v. City of New York, 374 F.3d 93, 126-27 (2d Cir.2004) (holding that even where it was a hospital's doctors who decided to admit the plaintiff for psychiatric observation, the police officer who took the plaintiff to the hospital was nonetheless subject to liability under § 1983 because it was foreseeable that the plaintiff would be detained at the hospital as a result of the officer's taking him there); Warner v. Orange County Dept. of Probation, 115 F.3d 1068, 1072-74 (2d Cir.1996) (holding that in recommending that the plaintiff be sentenced to an alcohol-treatment program that incorporated religious elements, a probation department could be held liable under § 1983 for violating the

plaintiff's First Amendment rights, even though a judge made the sentencing decision). In short, defendants who are sued under § 1983, are "'responsible for the natural consequences of [their] actions,'" <u>Warner</u>, 115 F.3d at 1071 (2d Cir. 1997) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 344 n. 7, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986)) (other internal quotation marks omitted). Thus, "an actor may be held liable for those consequences attributable to reasonably foreseeable intervening forces, including the acts of third parties." <u>Warner</u>, 115 F.3d at 1071 (internal quotation marks omitted). The declaration of Jamie Gallagher, appended hereto as Exhibit C, demonstrates the plausibility of the policies, practices, and customs here foreseeably leading to the use of excessive force. Exhibit C, ¶¶ 10-14.

The foreseeability requirement here is also satisfied by the fact that Mr. Witherspoon was reported, albeit falsely, as possibly armed with a gun. Amended Complaint, First Count, ¶ 44. Aside from it being logically apparent to any reasonable person that police are more likely to employ deadly force in situations where suspects are reportedly armed with guns, there is also academic research that supports this logic, particularly in situations, such as we have in this case, where the suspect (Ms. Washington's companion, Mr. Witherspoon) is falsely reported by dispatch as being armed. Taylor, Paul L., "Dispatch Priming and the Police Decision to Use Deadly Force," 23 <u>Police Quarterly</u> 311-332 (Dec. 30, 2019) ("[T]his study examined the effects of dispatch priming on an officer's decision to use deadly force. The findings suggest that officers rely heavily on dispatched

19

information in making the decision to pull the trigger when confronted with an ambiguously armed subject in a simulated environment. When the dispatched information was erroneous, it contributed to a significant increase in shooting errors.")[11]

Therefore, in both sum and substance, Ms. Washington alleges that her injuries were directly and proximately caused by defendant Pollock following the official laissez-faire policies and customs that existed or were permitted to exist, by:

a.   failing to make any contact with either Defendant Hamden's Dispatch, Defendant New Haven's Dispatch, Defendant Yale's Dispatch or Defendant Eaton after seeing Defendant Eaton's vehicle pass his location, despite having enough time to do so;

b.   failing to scan or monitor Defendant New Haven's Dispatch or Defendant Hamden's Dispatch even though he was actively participating in the BOLO;

c.   failing to turn on his headlights or flashers even after seeing Defendant Eaton turn around, come back towards Defendant Pollock's cruiser, and then turn down Argyle Street;

d.   as the senior officer on the scene from the local police force for Defendant New Haven, failing to assume control and supervision at the scene of this traffic stop involving Mr. Witherspoon, Ms. Washington and the red Honda Civic;

e.   failing to make his presence known to Defendant Eaton at this traffic stop, which increased the likelihood of confusion and prevented coordination at the scene between him and Defendant Eaton, which

---

[11] The article may be found by copying and pasting the following link into a web browser: https://journals.sagepub.com/doi/10.1177/1098611119896653.

> **failure was a substantial factor in causing the crossfire that occurred between Defendant Eaton and Defendant Pollock and the consequent injuries to Ms. Washington;**

Had defendant Pollock's conduct not been consistent with these policies, it is

entirely plausible that the plaintiff would not have been shot because:

> (i) **Even if defendant Eaton was properly in the City of New Haven, which is denied, he would not have acted unilaterally but for the policy of these defendants allowing Hamden officers to act unilaterally when engaging in police enforcement activity in New Haven. Instead, defendant Eaton would have:**
>
> > (a) **coordinated the initiation and execution of the traffic stop with defendant Pollock or some other officer from New Haven or Yale University, and**
> >
> > (b) **turned over supervision and control of the traffic stop to defendant Pollock or some other officer from New Haven or Yale University instead of initiating it on his own.**

Therefore, the plaintiff has plausibly alleged that these defendants created

policies that were the moving force in causing the plaintiff's injuries. Accordingly,

the motion to dismiss the Fourteenth Count should be denied.

> 4.   <u>The complaint alleges deliberate indifference</u>.

Deliberate indifference is a question of fact for the jury. See <u>Davis v. Hall</u>,

375 F.3d 703, 719 (8th Cir.2004). Defendants argue that there is no pattern or

custom alleged to plausibly establish deliberate indifference. Defendant's

Memorandum (doc. #40) at pp. 22-3. However, an examination of the underlying

allegations demonstrates that plaintiff is not complaining of isolated events. In

paragraph 83.a. of count fourteen, the practice of allowing officers from Hamden to act unilaterally when engaged in enforcement activity in New Haven necessarily implies that this has happened multiple times. Similarly, the allegation in paragraphs 83.b-g. of count fourteen also fairly implies repeated conduct in failing to ensure proper communication and coordination with and supervision over Hamden police officers entering New Haven to engage in non-emergency police enforcement activities.

Additionally, the allegations against both officers in this case also demonstrate multiple acts of misconduct with respect to this policy and custom. Defendant Eaton and Defendant Pollock are alleged to have failed to fulfill their respective duties to coordinate and communicate their actions with their own departments and with each other. Amended Complaint, Second Count, ¶ 80.b.-g. (for defendant Eaton); and Fifth Count, ¶ 80.a.-e. (for defendant Pollock). Consequently, the acts of both officers demonstrate the existence of this laissez-faire practice and custom. Hamden Officers unilaterally cross into the City of New Haven to engage in enforcement activity there without communicating or coordinating their activities with their police department or the police department for the City of New Haven, while officers from Yale University, and, therefore, the City of New Haven sit back and watch Hamden officers act unilaterally.

Moreover, basic deductive reasoning supports the conclusion that a pattern or custom exists. Which is the more plausible situation: (1) Officer Eaton

unilaterally travels into the City of New Haven without communicating or coordinating his activities with the police departments for the Town of Hamden and the City of New Haven because he is following established practice and custom; or (2) Officer Eaton hops into his police cruiser, goes rogue, and heads off into the City of New Haven without communicating or coordinating his activities with the police departments for the Town of Hamden or the City of New Haven? The much more plausible scenario is that defendant Eaton entered New Haven to engage in cross-policing activities without communicating or coordinating his activities with the police departments for either municipality because he was following established practice and custom.

Similarly, when defendant Pollock sees defendant Eaton engaging in enforcement activity in New Haven, defendant Pollock's initial response is to follow and observe defendant Eaton. Amended Complaint, First Count, ¶¶ 53-60. Defendant Pollock does not attempt to communicate or coordinate with defendant Eaton, make his presence known to defendant Eaton, or assume supervisory control over the traffic stop. The more plausible explanation for defendant Pollock's conduct is the existence of a laissez-faire practice or custom with respect to Hamden police engaging in enforcement actions in New Haven then his disregard, conscious or otherwise, of existing policies.

In addition to multiple incidents of misconduct, deliberate indifference may also be shown through expert testimony that a practice condoned by the

defendant municipality was "contrary to the practice of most police departments" was "particularly dangerous". See <u>Dodd v. City of Norwich</u>, 827 F.2d 1, 4-6 (2d Cir.). The declaration of Jamie Gallagher appended hereto as Exhibit C establishes that the failure of officers engaged in cross-policing efforts to communicate and coordinate their activities "present[s] a significant risk of police losing control of incidents and … putting the safety of citizens in unnecessary jeopardy, including the use of excessive, unnecessary force, in violation of" the constitutional rights of those citizens. Exhibit C, ¶ 13. Chief Gallagher goes on to declare that this significant risk was "known or should have been known to the Chiefs of Police for Hamden, Yale, and New Haven, and the Mayors of Hamden and New Haven," Exhibit C, ¶ 14. and that "a failure to implement proper policies and procedures to ensure safe, effective coordination between officers of different jurisdictions operating together in a high-risk mutual aid incident, or to train property police officers in those policies and procedures amounts to deliberate indifference to this significant, known risk." Exhibit C, ¶ 15.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully submits that the defendant's motion to dismiss the fourteenth count of the Amended Complaint should be denied.

THE PLAINTIFF,

BY:    /s/ John-Henry M. Steele (ct10187)
John-Henry M. Steele, Esq.
DEY SMITH STEELE, LLC
9 Depot Street, 2nd Floor
Milford, CT 06460
Tel.: (203) 882-3351
Fax: (203) 882-3359
E-mail: jhs@deysmith.com

## CERTIFICATION

I hereby certify that on Thursday, October 22, 2020, a copy of the foregoing was filed electronically and served by U.S. Mail, postage prepaid, on anyone unable to access, use or accept electronic filing. Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

/s/ John-Henry M. Steele (ct10187)

# Exhibit A

*Special Act*
*P.A. 83-466*

MEMORANDUM OF UNDERSTANDING

Agreement made this ___29th___ day of _September_, 1992 by and between Yale University, a corporation organized and existing by virtue of a special charter granted by the Colony and State of Connecticut (the "University"), and the City of New Haven, acting through its Board of Police Commissioners (the "Board").

WHEREAS, pursuant to Section 3 of Public Act 83-466, the City of New Haven, acting through the Board, may appoint persons designated by the University to act as Yale University police officers and such officers, having duly qualified under Section 7-294d of the Connecticut General Statutes and having been sworn, shall have all of the powers conferred upon municipal police officers of the City of New Haven; and

WHEREAS, pursuant to such statute, such officers shall be deemed for all purposes to be agents and employees of the University, subject to such conditions as may be mutually agreed upon by the City of New Haven, acting through the Board and the University;

NOW THEREFORE, the University and the Board do hereby agree as follows:

1.   The University may designate and the Board may appoint as Yale University Police officers persons who have successfully completed training in a municipal police training academy meeting the requirements of Section 7-294d of the Connecticut General Statutes.

2.   Yale University police officers, having been sworn, shall have and exercise the powers and authority conferred upon municipal police officers of the City of New Haven.  The Chief or Assistant Chief of Police of New Haven, in coordination with the Chief of Police of the Yale University Police Department or his designee, may summon Yale University police officers for emergency service.

3.   In all matters of promotion, termination, discipline and employment, personnel policies and procedures established by the University shall apply to Yale University Police Officers and shall be administered solely by the University.  Such officers shall be deemed for all purposes to be agents and employees of the University and shall be paid for their services, including while in emergency service for the City of New Haven, and receive any benefits to which they are entitled by law, from the University.

4.   The University shall defend, and indemnify and hold the City of New Haven harmless for any and all claims, damages, losses and expenses, including cost of defense, reasonably and necessarily incurred in any cause or action or claim against the City or any of its boards, agencies, officers or employees brought by any such Yale University officer or arising out of the acts or omissions of any such Yale University officers, except for any action or claim arising out of any acts or omissions of such Yale University officers while in emergency service for the City of New Haven.

Emergency service means police service provided in response to a specific request from the Chief or Assistant Chief of the City of New Haven for assistance on matters of an exigent nature beyond routine police activity.

Emergency service does not refer to the longstanding practice of Yale Police Officers backing up New Haven Police Units or responding to assist officers on or near the University campus.

5.   The University shall maintain at its own expense with an insurance company licensed to do business in Connecticut, at least the following forms of insurance:  (1) general liability and property insurance for all liability assumed under the indemnity clause with a combined limit of $1,000,000 each occurrence, (2) automobile and property damage insurance, including coverage for hired and borrowed cars, with a minimum limit of $1,000,000 each accident.

The minimum amounts of all such insurance shall not be less than those stated herein, but the stipulation of minimum amounts or the acceptance by the City of certificates indicating the limits of coverage shall in no way limit the liability of the policyholder on whose behalf this certificate is issued to any such amounts.

Certificates of insurance shall be submitted to the City before or upon the effective date of this agreement.  A certified copy of the insurance policy shall be submitted upon the City's request.

6.   In the event of any suspension or termination of employment a police officer by Yale University for any reason, such officer's police powers shall be automatically suspended or terminated, as the case may be, without further action on the part of the City or its Board of Police Commissioners.

Any such officer who is reinstated or re-employed by the University within a period of one year following any such suspension of employment by Yale University shall be deemed automatically reinstated or restored to such police powers by said Board of Police Commissioners after redesignation by Yale University.

Any such former officer who is reinstated or reemployed by the University following any such termination shall be reinstated or restored to such police powers by said Board of Police Commissioners after acting upon the redesignation and recommendation of Yale University.

7.  There shall be an Appendix A to this agreement, consisting of a Memorandum of Operations describing the coordination of police services between the New Haven and Yale University Police Departments.  This Appendix A may be revised from time to time by agreement of the Chiefs of Police of the New Haven and Yale University Police Departments and upon approval of the Board of Police Commissioners of the City of New Haven without the need for any amendment to this Agreement.

8.  This Agreement supersedes the March 23, 1984 Memorandum of Agreement between the parties which agreement is hereby specifically terminated and any previous agreements as to the matters contained herein and may not be amended except upon the written agreement of the parties, and except as provided in paragraph 7 for the amendment of Appendix A, and shall continue in effect from the date hereof until terminated by mutual agreement of the parties or by one of the parties effective July 1 of any year upon no less than ten months advance written notice to the other.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement by their representatives thereunto duly authorized.

Witness:                              YALE UNIVERSITY

_Suzanne Lewis_                       By: _Michael Finnerty_
                                      Michael Finnerty
                                      Its Vice President for
                                      Finance and Administration

Witness:                              BOARD OF POLICE COMMISSIONERS
                                      OF THE CITY OF NEW HAVEN

_Rosalyn S. Getz_                     By: _Donald McAulay_
                                      Donald McAulay
                                      Its President

Witness:

_Nicholas Pascarella_

APPROVED AS TO FORM AND CORRECTNESS

_Lindsley Barbato_
Assistant Corporation Counsel

## APPENDIX A

This memorandum of operations describes the coordination of police operations support services between the New Haven and Yale University Police Departments.  In order to promote the most efficient operation of the two police departments, certain support services are provided by the New Haven Police Department to the Yale University Police Department including, but not limited to the following:

o   Criminal investigation follow-up and supervision of major cases;

o   Records processing and crime analysis services;

o   Communication liaison and assignment of case numbers for incident reports;

o   Identification and crime scene services;

o   Prisoner transportation and detention;

o   Prisoner processing and tracking and recordkeeping of court dispositions;

o   Property and evidence services;

o   Juvenile offender services;

o   Assistance, upon request of the Yale Police Chief or his designee, in specific incidents, including but not limited to special events and demonstrations;

o   Joint patrols, as agreed to by the Chiefs of the New Haven and Yale Police Departments;

o   Bomb scene searches; and

o   Other specialized police services.

# Exhibit B

**John-Henry Steele**

| | |
|---|---|
| **From:** | Michael Wolak <MWolak@newhavenct.gov> |
| **Sent:** | Wednesday, September 30, 2020 10:10 AM |
| **To:** | John-Henry Steele |
| **Subject:** | RE: Washington v Eaton |

Hi John-Henry,

I just had a telephone conversation with the Chair of the Board of Police Commissioners, Anthony Dawson, and he confirmed that the Memorandum of Understanding between Yale University and the Board of Police Commissioners for the City of New Haven, dated September 29, 1992, is renewed on a yearly basis, so it would have been in effect on April 16, 2019.

Mike

**From:** John-Henry Steele <jhs@deysmith.com>
**Sent:** Wednesday, September 30, 2020 8:18 AM
**To:** Michael Wolak <MWolak@newhavenct.gov>
**Subject:** Washington v Eaton

**Please be cautious**
This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Good morning, Michael.

If you can confirm for me by written representation in reply to this e-mail that the terms of the attached Memorandum of Understanding between Yale University and the Board of Police Commissioners for the City of New Haven, dated September 29, 1992, was in full force and effect on April 16, 2019, I will indicate in my memorandum in opposition to your motion to dismiss that I have no objection to the Court entering an order dismissing the Ninth Count against the City of New Haven.

Sincerely,
John-Henry M. Steele, Esq.
Dey Smith Steele, LLC
9 Depot Street, 2nd Floor
Milford, CT 06460
Tel: 203.882.3351
Fax: 203.882.3359
Email: jhs@deysmith.com
Cell: 860.655.1860

1

# Exhibit C

<u>Declaration of Jamie Gallagher</u>

I, Jamie Gallagher, do hereby declare:

1.      I am a current resident of the State of Ohio. I have an AAS in Criminal Justice (Summa Cum Laude) from Eastern Gateway Community College, and received specialized advanced training from the Federal Bureau of Investigation National Police Academy, University of Virginia, Northcoast Polytechnic Institute, United States Homeland Security, Ohio Tactical Officers Association, Ohio Association of Chiefs of Police, Ohio Attorneys General Office, International Association of Chiefs of Police, United States Treasury Department, Reid Interview and Interrogation, Case Western Reserve University, and the Ohio Police Officer Training Academy (OPOTA).

2.      I began my professional law enforcement career in 1983, serving the City of North Olmsted Police Department in Ohio for thirty-four years. During the course of my career, I served as a Patrol Officer, Patrol Sergeant, Detective Sergeant, Patrol Lieutenant, Detective Lieutenant, Captain in both Operations and Administrative Divisions, and as the Chief of the Police. While in those positions, I also served as a State of Ohio OPOTA certified instructor in firearms, was a SWAT team commander for my agency and was a member of the Westshore Enforcement Bureau (WEB), a multi- jurisdictional tactical team.

3.      During my time as chief, I was on the Westshore Enforcement Bureau (WEB) board with chiefs of police from surrounding agencies where a new shared communication systems was purchased. The WEB Chiefs discussed and implemented how the departments would operate with the new system, developed new shared tactical operations and training for active shooters, and discussed other issues involving mutual aid between our departments as well as other agencies outside of our WEB group. I also was elected and served on the board of the Cuyahoga County Chiefs Association which has sixty-seven law enforcement agencies in the county. The board would assist with issues between the courts, the prosecutor's office, communication grants, and offered advice on shared issues with the different agencies. Currently I am the President of the Ohio Retired Police Chiefs Association.

4.      Five police departments in the Westshore Enforcement Bureau jurisdiction shared a main radio channel and a secondary channel for radio communication. If an agency had an emergency call, dispatch would clear the main channel and all other agencies would utilize the secondary channel. All agencies could still monitor the main channel due to the scanning function of the radios. This benefitted the area police officers and dispatchers because they could monitor the transmissions which made information sharing efficient and timely. Mutual aid requests could be made, all officers could relay their positions and tactical planning could be more easily accomplished, allowing improved officer safety. Shared radio channels also permitted

supervisors to monitor a situation in another jurisdiction that may lead to their jurisdiction, so better decisions could be made. This benefits the community in that timely and improved information received allows for better decision making by officers and supervisors, especially in a critical incident.

5.      I have been asked by Attorney John Henry Steele to review available documentation and evidence in the case of *Stephanie Washington v. Devin Eaton, et. al.* My review included the following:

      a.      Timeline of Events, Tuesday, April 16, 2019;

      b.      New Haven Incident April 16, 2019, 9-1-1 Call (transcript);

      c.      Photographs of the two police cars involved; other photographs of scene;

      d.      Multiple Surveillance videos and Officer Eaton's body camera video;

      e.      Arrest Warrant issued by the Office of the State's Attorney, New Haven Judicial District for Officer Devin C. Eaton (12 pages);

      f.      State of Connecticut Department of Public Safety Investigation Report by Detective Christopher R. Meier dated 7/24/2019;

      g.      Town of Hamden and City of New Haven Non-Emergency Interagency Agreement;

      h.      New Haven Police Department Incident Investigation Report, Case No. 19-014320;

      i.      Yale University Police Department Incident Investigation Report, Case No. 2019-01192.

6.      During the course of my review, I noted that the <u>Town of Hamden and the City of New Haven Non-Emergency Interagency Agreement</u> (the "Agreement") authorized full-time sworn police officers of the Hamden, Yale, and New Haven departments to exercise all law enforcement powers in each jurisdiction even for routine, non-emergency matters.

7.      The <u>Non-Emergency Interagency Agreement Between Hamden and New Haven Operational Guidelines</u> ("Guidelines") stated that officers involving inter-agency authority "*should ensure their objective is to accomplish a public safety initiative, and such action avoids, to the extent possible, unintended or undesirable consequences or will likely result in embarrassment to the municipalities involved.*" *Considerations may include, but not be limited to: "...d. Do you have communications with the agency?", and "e. is it necessary to act immediately?"* The Guidelines also stated:

*Upon taking action as authorized by this Agreement, any out of town officer shall notify such local department as to their location, nature of incident, and any assistance necessary as soon as practical and safe. The officer involved shall notify their home agency of the aforementioned information and have a case or incident number assigned to their activity. "On-scene" incident supervision will rest with the local agency.*

8.     The State Police Report notes that there is a "Hotline" that "broadcasts police radio transmissions that can be heard by dispatchers in nearby towns", and that the Hamden Police Department had notified the New Haven Police Department via the "Hotline" that there had been an armed robbery in Hamden.

9.     Officer Eaton made the decision to enter New Haven looking for the suspect vehicle before an interview with the individual who had placed the 911 call original was complete.

10.    In his statement contained in the above-listed Yale University Incident Investigation Report, Officer Pollock stated that even after positioning his vehicle with lights off in an attempt to spot the suspect vehicle, he was neither scanning nor monitoring either the Hamden Police Dispatch frequency, nor the "Hotline".  Even after seeing a Hamden Police cruiser pass his location in an apparent search for the suspect vehicle, there is no indication at any point that Officer Pollock made any effort, either via Hamden Dispatch or the Hotline, to make direct communications with Hamden Police Department Officer he knew was entering New Haven to look for the suspect vehicle. Likewise, Officer Eaton made no effort to communicate with New Haven Police Officers either via the Hotline or via direct monitoring of the New Haven police dispatch frequency.

11.    Officer Pollock also apparently did not turn on his lights or otherwise make his presence known to the Hamden officer after pulling out and following the Hamden cruiser onto Argyle Street, nor did he act in a manner that would have notified Officer Eaton that he was present on scene and that local supervision would have rested with Officer Pollack..

12.    The direct result of these failures of communication and coordination is that Officer Eaton believed he was alone with the suspect vehicle on Argyle Street, was unaware of the presence of a New Haven officer in his cruiser at the end of Argyle Street, and mismanaged the scene to the point where he felt deadly force was appropriate when it was not.

13.    A failure to implement proper policies and procedures to ensure safe, effective coordination between officers of different jurisdictions operating together in a high-risk mutual aid incident, or to train properly police officers in those policies and procedures, would present a significant risk of police losing control of incidents and therefore putting the safety of citizens in unnecessary jeopardy, including the use of excessive, unnecessary force, in violation of their constitutional rights.

14.    This significant risk would have or should have been known to the Chiefs of Police for Hamden, Yale and New Haven, and the Mayors of Hamden and New Haven.

15.     Consequently a failure to implement proper policies and procedures to ensure safe, effective coordination between officers of different jurisdictions operating together in a high-risk mutual aid incident, or to train properly police officers in those policies and procedures amounts to deliberate indifference to this significant, known risk.

I declare under penalty of perjury that the foregoing is true and

correct. Executed on this _____ *21st* _____ day of _

_____*October*_____, 2020.

_____
Jamie Gallagher