UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

STEPHANIE WASHINGTON      :
     Plaintiff,      :
     :      No. 3:20-CV-1111(VLB)
     v.      :
     :
DEVIN EATON, et al.      :      August 2, 2021
     Defendants.      :
     :
     :
     :

## MEMORANDUM OF DECISION ON DEFENDANTS' MOTIONS TO DISMISS, DKTS. 34, 37-39

     This matter arises from an officer-involved shooting in the early morning hours of April 16, 2019 in New Haven, Connecticut. *See generally* [Dkt. 15 (Am. Compl.)]. [1] That morning, Stephanie Washington was a passenger in a vehicle driven by Paul Witherspoon when it stopped at a gas station in Hamden, Connecticut. [Am. Compl. ¶¶ 30-32]. Aziz Abdullatff, the gas station attendant, called 911 and falsely reported that Mr. Witherspoon was in the process of attempting to rob customers with a gun. [Am. Compl. ¶¶ 38-43].

     About fifteen minutes later, Hamden police officer Devin Eaton, responding to the 911 report of the robbery in process, stopped the vehicle in New Haven and opened fire on Mr. Witherspoon, striking Ms. Washington multiple times. [Am. Compl. ¶¶ 59-71]. Officer Eaton fired some shots in the direction of Yale police

---

[1] The following facts are taken from the Amended Complaint and are assumed to be true. The Court draws all reasonable inferences in Plaintiff's favor. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

officer Terrance Pollock, who proceeded to fire "in the direction" of Mr. Witherspoon. [Am. Compl. ¶¶ 71-77]. Ms. Washington may have been wounded by a round fired by Officer Pollock; at the least, she alleges that his decision to fire "in the direction" of Mr. Witherspoon reinforced Officer Eaton's decision to keep firing his service pistol. [Am. Compl. ¶¶ 73-74].

Ms. Washington sued individuals, public officials, and entities affiliated with the gas station, the Town of Hamden, Yale University, and the City of New Haven based on its relationship to the Hamden and the Yale University police departments. Each group of defendants have moved to dismiss the complaint in whole or in part. For reasons discussed below, the Court grants the Hamden, New Haven, and Yale University Defendants' motions to dismiss and denies the gas station and its attendant's motion to dismiss.

## Background

To fully articulate the rationale for its decision and to provide critical context, the Court begins by delineating the legal relationship between the Town of Hamden, the City of New Haven, and Yale University as it relates to policing.

### A. Interagency Agreements

The Town of Hamden and the City of New Haven are contiguous municipalities. They entered into a Cross-Policing Agreement, executed by their respective mayors in March 2011. [Am. Compl. ¶ 21]. The agreement incorporates the terms of the police departments' Operational Guidelines. [Am. Compl. ¶¶ 22-25]. Pursuant to the terms of the Cross-Policing Agreement and the Operational

Guidelines, the police chiefs of Hamden and New Haven constitute an oversight board for the administration and performance of the agreement. [Am. Compl. ¶ 27]. The Cross-Policing Agreement and the Interagency Operational Guidelines are collectively referred to herein as the "Agreement and Guidelines" and individually referred to as the "Agreement" and "Guidelines," respectively.

Under the terms of the Agreement, in effect at all times relevant to this dispute, police officers had the authority to take any action outside of their respective municipality that they could take in their home jurisdiction, subject to the limitations specified in the Agreement and Guidelines and applicable state law. [Am. Compl. ¶ 28]. The Guidelines provide that "all participating agencies will ensure that officers are not actively engaged in proactive law enforcement activity outside of their home jurisdiction-unless engaged in a cooperative effort . . ." [excerpted at Am. Compl. ¶ 29]. Additionally, "out-of-town" officers are responsible for notifying the ". . . local department as to their location, nature of the incident, and any assistance necessary as soon as practical and safe." [*Id.*]. Incident supervision rests with the local agency. [*Id.*].

Yale University maintains a private police department. [Am. Compl. ¶¶ 13-14]. Although it is a private entity, Yale University's police officers are appointed by the City of New Haven's Board of Police Commissioner's pursuant to Public

Acts 1983, no. 83-466, § 3.[2] Yale University police officers have all enforcement powers conferred on New Haven police officers. [Am. Compl. ¶ 15].

Plaintiff alleges that Officer Pollock was acting in a "dual capacity" as a police officer for Yale and New Haven. [Am. Compl., Counts Six and Seven)]. Apart from citation to P.A. 1983, no. 83-466, § 3, which states Officer Pollock was an agent and employee of Yale University, subject to such conditions as may be mutually agreed upon by the New Haven Board of Police Commissioners and Yale University, Plaintiff does not allege the mutually agreed conditions or any other provision which altered his status as an employee of Yale University.

A memorandum of understanding between the university and the city, dated September 29, 1992, provides, in relevant part, that:

> all matters of promotion, termination, discipline and employment, personnel policies and procedures established by the University shall apply to Yale University Police Officers and shall be administered solely by the University. Such officers shall be deemed for all purposes to be agents and employees of the University and shall be paid for their services, including while in emergency service for the City of New Haven, and receive any benefits to which they are entitled by law, from the University.

---

[2] The statutory provision provides that: The city of New Haven, acting through its board of police commissioners, may appoint persons designated by Yale University to act as Yale University police officers. Such officers having duly qualified under Section 7-294d of the general statutes, and having been sworn, shall have all the powers conferred upon municipal police officers for the city of New Haven. They shall be deemed for all purposes to be agents and employees of Yale University, subject to such conditions as may be mutually agreed upon by the city of New Haven, acting through its board of police commissioners, and Yale University."

The provision is not codified into the Connecticut General Statutes. *See Mahon v. Comm'r of Dep't of Motor Vehicles*, No. CV010506612S, 2001 WL 746533, at *4 (Conn. Super. Ct. June 8, 2001)( explaining the uncodified status of Public Acts 1983, no. 83-466, § 3.)

[Dkt. 54, Ex. A. to. Pl. Mem. in Opp'n to New Haven Defs.] (Mem. of Understanding between Yale Univ. and the City of New Haven (Sept. 29, 1992) ¶ 3).

In addition, the Amended Complaint does not allege how the City of New Haven or its police department exercised supervision over Officer Pollock or the Yale University Police Department. Although "incident supervision rests with the local agency" and the incident occurred in New Haven, that provision does not apply because New Haven officers were not on the scene of the incident and thus were not present to supervise Officer Pollock. [excerpted at Am. Compl. ¶ 29].

Based on this language and defense counsel's representation that the memorandum of understanding was in effect at the time of the shooting, Plaintiff voluntarily withdrew her claim that the City of New Haven is obliged to indemnify Officer Pollock. [Dkt. 54 (Pl. Mem. in Opp'n to New Haven Defs. Mot to Dismiss) at 4-7]. Count Nine of the Amended Complaint is dismissed accordingly.

### B. The shooting

On the morning of April 16, 2019, Plaintiff was a passenger in her red Honda Civic, which was being driven by her companion, Mr. Witherspoon. [Am. Compl. ¶ 30]. At approximately 4:17 A.M., they stopped for fuel in Hamden, Connecticut at a gas station operated by T&S United, LLC. [Id.]. Mr. Witherspoon parked the vehicle in front of a gasoline pump close to the late-night service window, exited the vehicle, and then approached Mr. Abdullattf, who was the gas station attendant. [Am. Compl. ¶ 32].

At about the same time, Jordany Rodriguez pulled his vehicle up to a different gas pump adjacent to Plaintiff's vehicle and then walked past the front of

Plaintiff's vehicle, towards the service window. [Am. Compl. ¶ 33]. Mr. Witherspoon and Mr. Rodriguez then "engaged in some sort of discussion near the late-night service window." [Am. Compl. ¶ 34]. Plaintiff remained in her vehicle and did not hear their conversation and the complaint does not describe the nature of the men's encounter. [Am. Compl. ¶¶ 34, 36].

About two minutes after their encounter, Mr. Witherspoon "tapped the back" of Mr. Rodriguez's vehicle, who then drove off. [Am. Compl. ¶ 37]. After witnessing their interaction, Mr. Abdullatff called 911 to report an attempted robbery. [Am. Compl. ¶¶ 38-39]. The Amended Complaint excerpts the following portion of the 911 call:

> Defendant Abdullatff: Uh, I have my delivery for the newspaper. Uh, somebody who delivered my newspaper and I have, like, a regular customer driver a red car (UI) license plate AK63322 long dreads parking here, long dreads. He pulled a gun at the guy who delivered the paper here in Hamden its clear he was asking for money outside, outside a gas station.
>
> Defendant Hamden's Dispatch: Ok, so did he take his money?
>
> Defendant Abdullattf: No. The guy who jumped in the car run right away.
>
> . . .
>
> Defendant Abdullattf: . . . I need some help. He's a dangerous. He's harassing the second customer, too.
>
> Defendant Hamden's Dispatch: . . . [i]s he a white male, black male?
>
> Defendant Abdullattf: Black, African American. He goes, he goes to the, he goes to the Arch to Dixwell.
>
> . . .
>
> Defendant Hamden's Dispatch: He's in the car now?
>
> Defendant Abdullattf: He's in the car with the female, yes.
>
> . . .

Defendant Hamden's Dispatch: . . . [h]e take the Arch Street to Dixwell, yes.
. . .

Defendant Abdullattf: OK. We have help on the way.

[Am. Compl. ¶ 39].

The gas station's video surveillance shows no effort by Mr. Witherspoon to rob Mr. Rodriguez at gunpoint. [Am. Compl. ¶ 42]. Mr. Rodriguez later told state investigators that Mr. Witherspoon did not threaten him with a weapon. [Am. Compl. ¶ 43].

During the 911 call, Hamden dispatch directed Officer Eaton and another officer to the scene. [Am. Compl. ¶ 44]. They were informed that there was a robbery with a possible gun used and that dispatch was attempting to confirm whether the gun was used through further discussion with Mr. Abdullattf. [*Id.*]. Hamden dispatch then relayed to New Haven dispatch via the "Hotline" to be on the lookout for the red Honda Civic, noting its general direction, that a "gun was used in a street robbery," that "it was a black male operating [the vehicle]," and "there's supposedly a female inside." [Am. Compl. ¶ 45]. Hamden dispatch did not specify that the driver was the alleged robber, and that the female passenger was a bystander to the alleged robbery. [*Id.*]. New Haven dispatch then rebroadcasted a description of the vehicle and its license plate number, that the vehicle was involved in a street robbery, and that there were two occupants in the vehicle. [Am. Compl. ¶¶ 46-47].

About three minutes after the dispatch call from Hamden to New Haven, the message was relayed from New Haven to Yale University and then dispatched by

the university to its officers. [Am. Compl. ¶¶ 48-50]. In response to the re-broadcast, Yale University police officer Terrence Pollock pulled his cruiser against the curb of the northbound travel lane of Dixwell Avenue, just north of Dixwell Avenue's intersection with Argyle Street in New Haven. [Am. Compl. ¶¶ 52-53]. The Court takes judicial notice of the fact that Dixwell Avenue is a main throughfare running through Hamden and into New Haven. *See* Fed. R. Evid. R. 201(b).

Officer Eaton traveled south down Dixwell Avenue towards New Haven when he passed Officer Pollock. [Am. Compl. ¶¶ 53-54]. Officer Eaton then performed a U-turn into the northbound lane of Dixwell Avenue, then turned right onto Argyle Street. [Am. Compl. ¶¶ 53-54]. At about the same time, Mr. Witherspoon backed the Honda Civic out of a driveway and onto Argyle Street, traveling back towards Dixwell Avenue. [Am. Compl. ¶ 55]. Officer Pollock also performed a U-turn and turned left onto Argyle Street, where he observed Officer Eaton slowly approaching the Honda Civic. [Am. Compl. ¶¶ 56-58]. Officer Eaton positioned his cruiser diagonally to block Argyle Street. [Am. Compl. ¶ 58]. Officer Pollock also blocked-in the Honda Civic from a different direction. [Am. Compl. ¶ 56].

Officer Eaton exited the vehicle, drew his pistol, and ordered Mr. Witherspoon to exit the vehicle and to show his hands. [Am. Compl. ¶ 59]. As Mr. Witherspoon complied by opening the door with his hands raised, Officer Eaton shot at him. [Am. Compl. ¶ 66]. Mr. Witherspoon then retreated into the Honda Civic. [Am. Compl. ¶ 67]. Officer Eaton moved behind the Honda Civic and fired through the rear windshield. [Am. Compl. ¶ 70]. He then moved to the passenger side window and continued to fire. [*Id.*]. Officer Eaton fired a total of 13 rounds,

including eight directed towards the front passenger's seat that Plaintiff occupied while Mr. Witherspoon occupied the driver's seat. [Am. Compl. ¶ 78].

One or two rounds fired by Officer Eaton hit Officer Pollock's cruiser. [Am. Compl. ¶ 68]. Officer Pollock then fired three rounds from his pistol in Mr. Witherspoon's general direction, including a round that passed through the front windshield and may have caused injuries to Plaintiff's forehead. [Am. Compl. ¶¶ 72-73].

Plaintiff alleges that the negligent actions of Officers Eaton and Pollock were mutually reinforcing in their decisions to shoot at the vehicle and its occupants.   [Am. Compl. ¶¶ 74-75]. Plaintiff was shot four times and sustained serious physical and psychological injuries. [Am. Compl. ¶ 79]. Mr. Witherspoon was not hit and is not a party to this action. *See* [Am. Compl. ¶ 68].

## Analysis

### A. Standard for Motion to Dismiss pursuant to Fed. R. Civ. P. 12(b)(6)

To survive a motion to dismiss, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  In considering a motion to dismiss for failure to state a claim, the Court should follow a "two-pronged approach" to evaluate the sufficiency of the complaint. *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010). "A court 'can choose to begin by identifying pleadings

that, because they are no more than conclusions, are not entitled to the assumption of truth.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "At the second step, a court should determine whether the 'wellpleaded factual allegations,' assumed to be true, 'plausibly give rise to an entitlement to relief.'" *Id.* (quoting *Iqbal*, 556 U.S. at 679). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (internal quotations omitted).

In general, the Court's review on a motion to dismiss pursuant to Rule 12(b)(6) "is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). The Court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

B. Defendants' Motions to Dismiss

As addressed above, the fourteen-count complaint raises claims against individuals, public officials, and entities associated with the gas station, the Town of Hamden, Yale University, and the City of New Haven. Because of the overlap of factual and legal issues, the Court will address the relevant law for Plaintiff's claims and the Defendants' motions to dismiss thematically.

The Court will first address the general legal standard for Plaintiff's claims for municipal liability pursuant to § 1983. *See Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658, 691, 694 (1978). The Court will then consider Plaintiff's *Monell* claims against the Hamden Defendants, the New Haven Defendants, and then the Yale University Defendants. These claims and arguments are mostly duplicative. Next, the Court will address Plaintiff's vicarious liability claims against Yale University, first under respondeat superior for the § 1983 claim against Officer Pollock and then for statutory indemnification pursuant to Conn. Gen. Stat. § 7-465(a). Finally, the Court will consider Plaintiff's claims for "false report" against Mr. Abdullatff and vicariously against T&S United, LLC.


C. *Monell* claims generally

A municipality may be liable under § 1983 only "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell*, 436 U.S. at 692). Municipalities are "responsible only for 'their own illegal acts,' " and cannot be held "vicariously liable under § 1983 for their employees' actions." *Id.*; *see also Roe v. City of Waterbury*, 542 F.3d 31, 36–37 (2d Cir.2008) (holding that municipality cannot be held liable under § 1983 for acts of its employees under doctrine of respondeat superior). Rather, a "plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury." *Roe v. City of Waterbury*, 542 F.3d at 37 (quoting

*Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)). "Liability for unauthorized acts is personal; to hold the municipality liable, *Monell* tells us, the agent's actions must implement rather than frustrate the government's policy." *Id.* at 36-37 (quoting *Auriemma v. Rice*, 957 F.2d 397, 400 (7th Cir.1992)). The municipality's policy or custom must amount to deliberate conduct, rather than conduct that is merely attributable to the municipality. *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. at 404.

To state a claim under § 1983 against a municipality, a plaintiff must show "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007). A plaintiff must prove "both the existence of a municipal policy or custom and a causal connection between that policy or custom and the deprivation of [her] constitutional rights." *Dodd v. City of Norwich*, 827 F.2d 1, 5 (2d Cir. 1987).

"Courts have recognized four ways for plaintiffs to demonstrate a policy or custom: (1) a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers; (2) conduct ordered by a municipal official with policymaking authority; (3) actions taken pursuant to governmental custom even though such a custom has not received formal approval through the body's official decision making channels; or (4) a failure to train municipal employees that amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." *Walker v. City of New York*, No. 12-CV-5902, 2014 WL 1259618, at *2 (S.D.N.Y. Mar. 18, 2014) (internal citations and quotation marks omitted).

### a. *Monell* claims as to the Hamden Defendants

Plaintiff alleges that she was shot because the Town of Hamden and its policymakers, Curt Leng in his official capacity as mayor and John Sullivan, in his official capacity as the Chief of Police (collectively the "Hamden Defendants"):

> a. allowed a policy, procedure, practice, and custom to exist where officers from the Hamden Police Department would act unilaterally when engaged in proactive law enforcement activities in New Haven;
>
> b. failed to establish policies, procedures, practices and customs to ensure the proper coordination of activities and the proper supervision of their officers by officers from Yale Univ. Police Department or the New Haven Police Department, when Hamden police officers were engaged in proactive law enforcement activities in New Haven;
>
> c. failed to implement a proper training program to ensure their officers coordinated with and were supervised by officers from Yale Univ. Police Department or the New Haven Police Department, when Hamden police officers were engaged in proactive law enforcement activities in New Haven;
>
> d. failed to create and adopt policies, procedures, practices, and customs to define the circumstances when it was appropriate to enter New Haven for non-emergency proactive law enforcement activities;
>
> e. alternatively, if policies, procedures, practices, and customs exist that define when entering New Haven for non-emergency law enforcement activities was appropriate, failing to ensure that they were followed consistently;
>
> f. failed to establish a proper communications system and protocols to ensure that officers from different jurisdictions could easily and efficiently communicate with each other when engaged in proactive law enforcement activities together;
>
> g. alternatively, if such a communications system exists, failing to ensure that it was used in situations involving cross-jurisdictional policing activities.

[Am. Compl., Count Twelve].

In other words, Plaintiff alleges that, if it were not for the lack of specific operational protocols or the proper training and enforcement of compliance with

such protocols in the Agreement and Guidelines, Officer Eaton would not have entered New Haven on a "non-emergency" basis and would not have unilaterally engaged Mr. Witherspoon. [Dkt. 42, Pl. Mem. in Opp'n to Hamden Defs. at 8-12]. Plaintiff argues "[h]ad defendant Eaton's activities been coordinated through the Police Department for the City of New Haven and Yale University, it is entirely plausible that coordinating with police from [these jurisdictions] would have prevented this traffic stop from devolving into police use of deadly force…" [*Id.* at 9-10]. Plaintiff argues that her injuries were foreseeable because police were responding to a report (albeit false) that a firearm was used in a robbery and were therefore more likely to use their weapons.

In support of their motion to dismiss, the Hamden Defendants argue, *inter alia*, that Plaintiff fails to allege that an official policy or custom directly caused her injuries. [Dkt. 34 (Hamden Defs. Mem. in Supp.) at 10-11]. The Hamden Defendants argue that Plaintiff relies on a hypothetical sequence of events that could have happened had Officer Eaton acted in accordance with the Agreement and Guidelines. [Dkt. 47 (Hamden Defs. Repl. Br.) at 5-6]. The Hamden Defendants argue that Plaintiff has not alleged facts regarding any other incidents, prior to April 2019, where Hamden police officers have violated the constitutional rights of others in a manner that would put the town and its officials on notice of a pattern of violations that might suggest additional protocols or training in such protocols was necessary, in support of her *Monell* claim. [*Id.* at 8-9].

For purposes of the defendants' motions, the Court accepts Plaintiff's strained view that Officer Eaton's pursuit of the Honda Civic, which was being

driven by an individual that he had reason to believe was armed and dangerous, was a "non-emergency." [Am. Compl. ¶ 28]. As a "non-emergency", to exercise police power outside of his jurisdiction, Officer Eaton was required to comply with the Agreement and Guidelines. Plaintiff alleges that Officer Eaton violated these Guidelines by entering New Haven in the first instance and then by failing to communicate and coordinate with the respective jurisdictions. [Am. Compl., Count One]. Consequently, Plaintiff was caught in a crossfire between Officers Eaton and Pollock.

Parsing these allegations, the Court agrees with the Hamden Defendants that Plaintiff failed to allege that the Agreement and Guidelines themselves were the "moving force" causing her particular injuries. For example, suppose that Officer Eaton stopped the Honda Civic in New Haven without issue. Under that scenario, the fact that Officer Eaton was a Hamden police officer, rather than a New Haven police officer, does not affect the constitutional analysis.

Plaintiff concedes that the Agreement and Guidelines were "authorized by statute." [Am. Compl. ¶ 25]; *see also* Conn. Gen. Stat. § 7-277a. Plaintiff does not allege that the Agreement and Guidelines themselves are unlawful or unconstitutional. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985) (citing the municipal policy mandating non-medical leave for pregnant employees at issue in *Monell* for the proposition that the single application of an unconstitutional policy can satisfy the requirements for municipal liability).

Plaintiff is correct at an abstract level; Plaintiff would not have been shot if the Town of Hamden did not have a "policy" of establishing a police force.

15

However, the U.S. Supreme Court in *City of Oklahoma City v. Tuttle* rejected this degree of abstraction. 471 U.S. at 823 (plurality opinion considering and rejecting this observation). Instead, "… *Monell* must be taken to require proof of a city policy different in kind from this latter example before a claim can be sent to a jury on the theory that a particular violation was "caused" by the municipal "policy." At the very least there must be an affirmative link between the policy and the particular constitutional violation alleged." *Id*. Stated another way:

> it is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its *deliberate* conduct, the municipality was the "moving force" behind the injury alleged. That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights.

*Board of Cnty. Comm'rs v. Brown*, 520 U.S. at 404 (italics in original)

Absent a claim that action by a policymaking official directly violated federal law or directed or authorized the deprivation of federal rights, a plaintiff must establish deliberate indifference on the part of the policymaking representative, not merely to the risk of any constitutional injury, but of the particular injury suffered by the plaintiff. *Board of Cnty. Comm'rs v. Brown* at 404-05. Therefore, Plaintiff has failed to plausibly allege that an official policy of the Town of Hamden directly deprived her of her constitutional rights.

Instead, her *Monell* claim rests on her allegation that the Town of Hamden failed to implement appropriate policies and to train its officers to perform their policing duties in accordance with the Agreement and Guidelines. Specifically,

Plaintiff alleges that the Hamden Defendants failed to establish proper lines of communication between responding officers from different jurisdictions.

To support a claim based on inaction, the "custom" or "policy" must be demonstrated by showing that the municipality's failure to supervise or properly train its police force is so severe as to constitute "deliberate indifference" to a plaintiff's rights. *See City of Canton v. Harris*, 489 U.S. 378, 388–89 (1989). The phrase "deliberate indifference" means more than "simple or even heightened negligence"; it involves a "conscious disregard" on the part of municipal employers for the consequences of their actions. *Board of Cnty. Comm'rs v. Brown*, 520 U.S. at 407. Deliberate indifference is a stringent standard. *Connick*, 563 U.S. at 62. "Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied." *Canton v. Harris*, 489 U.S. at 396 (O'Connor, *J.*, concurring).

The plaintiff must show that the need for more or better protocols or supervision to protect against constitutional violations was obvious, such that it amounts to a deliberate choice by the municipality. *See, e.g. Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir.1995). "An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents." *Id.*

Here, Plaintiff does not allege a pattern of prior constitutional violations that would have placed the Town of Hamden on notice that its failure to institute policies or provide specific training to give effect to the Agreement and Guidelines would lead to the type of injuries that Plaintiff suffered. Instead, Plaintiff would need to state a claim for "single incident liability."

In *Canton v. Harris*, the U.S. Supreme Court hypothesized that, given the "moral certainty" that police officers would need to arrest fleeing felons, it is patently obvious that a municipality that arms its officers would need to train its officers on constitutional limitations on the use of deadly force to arrest fleeing felons. 489 U.S. at 390, n. 10. Subsequent authority has confined the " '… narrow range of circumstances,' [where] a pattern of similar violations might not be necessary to show deliberate indifference." *Connick*, 563 U.S. at 63 (holding that a district attorney's failure to train prosecutors on their *Brady* obligations did not fall within *Canton*'s single-incident liability hypothetical).

Drawing all inferences in Plaintiff's favour, she does not state facts to suggest that Officer Eaton and Officer Pollock's allegedly unreasonable use of deadly force was a "known or obvious" consequence of the Town of Hamden's failure to institute policies, protocols or provide specific training to give effect to the Agreement and Guidelines. The remote risk of injuring innocent civilians during a crossfire between two officers from different jurisdictions failing to communicate with each other while responding to a "non-emergency" does not rise to the level of "moral certainty" to place the Town of Hamden on notice of the need to remediate this danger.

18

Accordingly, the Court dismisses the *Monell* claim as to the Hamden Defendants without prejudice.

The Amended Complaint names Mayor Leng and Acting Police Chief Sullivan in their official capacities only and does not allege supervisory liability under § 1983. *See* [Am. Compl. ¶¶ 8-9]; [Dkt. 42 (Pl. Mem. in Opp'n to Hamden Defs.) at 12-14]. Mayor Leng and Acting Chief Sullivan are dismissed as parties. The Court's ruling on Plaintiff's *Monell* claim moots the issue of whether the Hamden Police Department is a separate legal entity capable of suing or being sued. Accordingly, the Hamden Police Department is also dismissed as a defendant.

### b. Plaintiff's *Monell* claims as to the New Haven Defendants

Plaintiff's allegations against the City of New Haven, the New Haven Police Department, Mayor Elicker, and Chief of Police Reyes (collectively the "New Haven Defendants") fails to plausibly allege a *Monell* claim for substantially the same reasons as discussed above. Count Fourteen of the Amended Complaint reincorporates the same factual allegations as alleged against the Hamden Defendants as to the existence of the Agreement and Guidelines and the failure to institute appropriate policies, protocols, and training. [Am. Compl. ¶¶ 83-84].

Neither the New Haven Defendants nor the Plaintiff raise controlling case law that was not previously addressed by the Court with respect to the Hamden Defendants' motion to dismiss. Plaintiff's allegations against the New Haven Defendants are even further attenuated from the causal chain.

In sum, Plaintiff alleges that the New Haven defendant's failure to institute necessary policies, protocols and training caused Officer Pollock, a Yale Police Officer, to take "such a laissez-faire approach to the presence of a shooter here, Officer Eaton, unilaterally engaging in police enforcement activity in the City of New Haven." [Dkt. 54 (Pl. Mem. in Opp'n to New Haven Defs.) at 17](citing *Fiacco v. City of Rensselaer*, 783 F.2d 319, 327 (2d Cir.1986), *cert. denied*, 480 U.S. 922 (1987)).

As was the case with Plaintiff's allegations against the Hamden Defendants, Plaintiff does not allege any prior events that would have placed the City of New Haven on notice that its failure to implement policies, protocols or training directed at interagency operations would result in the type of injuries that Plaintiff suffered. This distinguishes Plaintiff's allegations from *Fiacco,* 783 F.2d at 328 ("...the very assertion of a number of such claims [for excessive force] put the City on notice that there was a possibility that its police officers had used excessive force. The City's knowledge of these allegations and the nature and extent of its efforts to investigate and record the claims were pertinent to [Plaintiff's] contention that the City had a policy of nonsupervision of its policemen that reflected a deliberate indifference to their use of excessive force.").

The Court need not consider the affidavit of Jaime Gallagher, which was appended to Plaintiff's opposition brief. [Dkt. 54, Ex. C]. The affidavit constitutes extrinsic evidence and Plaintiff did not move the Court to convert the Defendants' motion to dismiss to a motion for summary judgment. *See Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1010 (2d Cir. 1986).

20

Nonetheless, addressing the merits, Mr. Gallagher, a former police chief in Ohio, states without any factual detail that the risk of using excessive, unnecessary force in a "high risk mutual aid incident" "would have or should have been known to the Chiefs of Police for Hamden, Yale, and New Haven, and the Mayors of Hamden and New Haven." [Gallagher Aff. ¶ 14]. The conclusory statement does not delineate how the Agreement and Guidelines were deficient to mitigate such a risk or otherwise provide any factual enhancement tending to show the "moral certainty" of police encountering the scenario that occurred in April 2019.

Accordingly, the Court dismisses the *Monell* claims against the New Haven Defendants without prejudice. Since Plaintiff voluntarily dismissed her claim against the City of New Haven for indemnification of Officer Pollock pursuant to Conn. Gen. Stat. § 7-465, there are no pending claims against any of the New Haven Defendants.

### c. Plaintiff's *Monell* claims as to Yale University Defendants

Yale University is a private entity. [Am. Compl. ¶ 13]. Nevertheless, private entities may be subjected to liability under § 1983 for deprivation of rights secured by the Constitution or by federal law when committed by a person acting under the color of state law. *See Brentwood Acad. v. Tenn. Secondary Sch. Ath. Ass'n*, 531 U.S. 288, 296 (2001)(discussing factors where challenged activity may be state action).

The Yale University Defendants do not contest that the university is performing state action through its police department, which performs a

governmental policing function and has arrest authority. *See supra*. 3 at n. 2. Instead, Yale University argues that Plaintiff failed to state a *Monell* claim because Plaintiff does not plausibly allege that Yale was deliberately indifferent to the risk of depriving individuals of their constitutional rights. [Dkt. 38 (Yale Univ. Defs. Mot to Dismiss) at 10-15]. For reasons previously stated, the Court agrees with the Yale University Defendants that the university's alleged failure to ensure proper coordination and supervision over Hamden police officers operating in New Haven does not amount to a conscious disregard for constitutional rights.

Plaintiff's opposition brief to the Yale University Defendant's motion to dismiss shifts the framing of whether the Agreement and Guidelines amount to a "policy" or "custom". Plaintiff argues that she alleges "multiple acts of misconduct" based on "a practice of allowing officers to act unilaterally when engaged in law enforcement activity in New Haven." [Dkt. 44 (Pl. Mem. in Opp'n to Yale Univ. Defs.) at 12-13]. Plaintiff also alleges that subparagraphs b-g, excerpted at *supra*. 13, "fairly imply repeated conduct." [*Id.* at 13]. The Court disagrees. Plaintiff does not allege a sufficient factual basis to put Defendants on notice of how the Agreement and Guidelines resulted in "repeated conduct" which provided actual or constructive notice to the municipal defendants of an obvious need to implement policies, protocols, or training regarding interagency operations to prevent the violation of constitutional rights.

Accordingly, the Court dismisses Count Thirteen, without prejudice.

D. <u>Plaintiff's vicarious liability claims against Yale University</u>

Plaintiff asserts three claims for vicarious liability against the Yale University Defendants: Count Six alleges that the university is vicariously liable for Officer Pollock's common law negligence under the doctrine of respondeat superior, Count Seven alleges that the university is vicariously liable for Officer Pollock's deprivation of Plaintiff's Fourth Amendment Rights pursuant to § 1983, and Count Eight seeks statutory indemnification pursuant to Conn. Gen. Stat. § 7-465(a). The Yale University Defendants move to dismiss the latter two claims.

a. <u>Respondeat superior for private entities under § 1983</u>

In support of its motion to dismiss, Yale University argues that the doctrine of respondeat superior is inapplicable to cases brought pursuant to § 1983. [Dkt. 40 (Yale Univ. Defs. Mem. in Supp.) at 4-5] (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003) and *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 409 (2d Cir. 1990)).[3]

Strictly speaking, *Monell* dealt with a public employer. However, in the Second Circuit, the principle that public employers are not liable for constitutional

---

[3] To be clear, vicarious liability for torts is a distinct issue from whether a municipality or private entity can be held vicariously liable for the deprivation of constitutional rights under the color of state law pursuant to 42 U.S.C. § 1983. *See supra.* (discussing *Monell* and its progeny). The Amended Complaint includes a claim that Yale University is vicariously liable for Officer Pollock's alleged common law negligence. *See* Count Six. The university has not moved to dismiss Count Six.

torts of their employees under § 1983 has been extended to private employers. *Rojas*, at 924 F.2d at 408.

In opposition, Plaintiff provides a five-page block citation of the Seventh Circuit's decision in *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782 (7th Cir. 2014), which explained in dicta that it would have applied the doctrine of respondeat superior to the facts of that case. [Dkt. 44 (Pl. Mem. in Opp'n to Yale Univ. Defs.) at 15-20]. Plaintiff argues that neither case cited by the university, *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406 (2d Cir. 1990) and *Wells v. Yale Univ.*, 2011 U.S. Dist. LEXIS 82453 (D. Conn. July 28, 2011), discuss the arguments for limiting *Monell*'s application to private entities that were presented in *Shields*.

*Shields* advances a critical, but ultimately unavailing view that *Monell*'s rejection of respondeat superior should be broadly reexamined and should not be extended to private entities. *See Shields*, 746 F.3d at 792 ("Given these flaws on the surface of its reasoning, *Monell* is probably best understood as simply having crafted a compromise rule that protected the budgets of local governments from automatic liability for their employees' wrongs, driven by a concern about public budgets and the potential extent of taxpayer liability."). Nevertheless, the panel in *Shields* recognized that it was bound by controlling precedent. *Id.* at 794 (citing *Iskander v. Vill. of Forest Park*, 690 F.2d 126 (7th Cir. 1982) as controlling authority); see *also Wilson v. Wexford Health Sources, Inc.*, 932 F.3d 513, 522 (7th Cir. 2019) (noting that the Seventh Circuit declined to rehear *Shields en banc* and *Iskander* remains binding authority). *Shields* acknowledged that every circuit to have considered the issue has extended *Monell* to private entities, shielding employers

24

from vicarious liability. *Id.* at 790, n. 2 (collecting cases). Since *Shields* was decided, no circuit has reversed its precedent nor adopted the panel's reasoning in the first instance.

Here, there has been no intervening change in the law by the U.S. Supreme Court. *Rojas v. Alexander's Dep't Store, Inc.* remains binding precedent in the Second Circuit. *Rojas* is consistently applied. *See, e.g. Crenshaw v. New York City Hous. Auth.*, 697 F. App'x 726, 732 (2d Cir. 2017) (summary order) (quoting *Rojas* for the proposition that *Monell* applies to private entities); *Candelario v. Quality Choice Corr. Healthcare*, No. 16-CV-2083 (KMK), 2017 WL 3049553, at *5 (S.D.N.Y. July 18, 2017)(citing additional examples applying *Rojas*); and *Wells v. Yale Univ.*, 2011 U.S. Dist. LEXIS 82453 (D. Conn. July 28, 2011)

Given the well-settled controlling law in this circuit, the Court dismisses Count Seven of the Complaint without leave to amend.

### b. Statutory indemnification pursuant to Conn. Gen. Stat. § 7-465(a)

Conn. Gen. Stat. § 7-465(a) provides, in relevant part, that:

> (a) *Any town, city or borough ... shall pay on behalf of any employee of such municipality* ... all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for infringement of any person's civil rights or for physical damages to person or property, except as set forth in this section, if the employee, at the time of the occurrence, accident, physical injury or damages complained of, was acting in the performance of his duties and within the scope of his employment, and if such occurrence, accident, physical injury or damage was not the result of any wilful or wanton act of such employee in the discharge of such duty.

(emphasis added)

Yale University relies on the fundamental principles of statutory construction, arguing that it is not obliged to pay damages that are attributable to Officer Pollock because the statute only imposes a duty to indemnify on towns, cities or boroughs and it is not a "town, city or borough." [Dkt. 40 (Yale Univ. Defs.' Mem. in Supp.) at 5-7]. The university cites *Jackson-Colon v. Bridgeport Hous. Auth.*, 2007 Conn. Super. LEXIS 1169, *1-2 (Conn. Super. Ct. May 7, 2007) (Hiller, *J.*) for the proposition that Connecticut's municipal immunity and indemnification statutes are limited in scope to the types of parties enumerated within the statute. [*Id.* at 6-7].

In opposition, Plaintiff argues that Yale University's Police Department is "part of the City of New Haven," because it is undisputed that its police officers have the same authority as the City of New Haven's police officers pursuant to P.A. 1983, no. 83-466, § 3. [Dkt. 44 (Pl. Mem. in Opp'n to Yale Univ. Defs.) at 20].

The Court agrees that Conn. Gen. Stat. § 7-465(a) is inapplicable to Yale University. A district court interpreting a state statute must "carefully predict how the state's highest court would rule if confronted with the issue, including how it would resolve any ambiguity in the statute." *KLC, Inc. v. Trayner*, 426 F.3d 172, 176 (2d Cir. 2005) (citation omitted). Under Connecticut law, "[t]he meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." Conn. Gen. Stat. § 1-2z.

To rule Conn. Gen. Stat. § 7-465(a) is applicable to Yale University would require the court to disregard the clear language of the statute which created the force.  P.A. 1983, no. 83-466, § 3 states Yale University police officers are agents and employees of Yale University, subject to such conditions as may be mutually agreed upon by the New Haven Board of Police Commissioners and Yale University. Plaintiff does not allege any mutually agreed condition or any other provision which altered their status as Yale University employees.  Since Yale University police officers are not New Haven employees, the remaining question is whether the statutory duty to indemnify applies to Yale University.

Applying those principles of statutory construction, the duty to indemnify does not apply because Yale University is not a "town, city or borough," regardless of its relationship to the city.  The interpretation of Conn. Gen. Stat. § 7-465(a) can be resolved at the first step. The term "town, city or borough" is unambiguous in that it refers to a municipality. *See* Conn. Gen. Stat. § 7-148 (defining a "municipality" as "any town, city or borough, consolidated town and city or consolidated town and borough."). "Generally, a municipality is immune from liability unless the legislature has enacted a statute abrogating such immunity." *Gaudino v. Town of Hartford*, 87 Conn. App. 353, 355 (2005) (citation omitted). Moreover, "[a]t common law, municipal officers were liable for their own torts, but the municipality, their municipal 'master,' was not vicariously liable for those torts.... [Section] 7–465(a) effectively circumvented the general common law immunity of municipalities from vicarious liability for their employees' acts by permitting injured plaintiffs to seek indemnification from a municipal employer for

such acts under certain circumstances and after conformance with certain statutory requirements, but it did not bar a plaintiff from seeking redress from those employees." *Grady v. Town of Somers*, 294 Conn. 324, 337 (2009) (citation omitted).

In contrast, a private employer can be held vicariously liable for torts committed by its agents in the course of their employment through the doctrine of respondeat superior without resort to statutory indemnification. *See Fiano v. Old Saybrook Fire Co. No. 1, Inc.*, 332 Conn. 93 (2019) (discussing the agency requirements to establish respondeat superior and its policy rationale); *see also supra*. n. 3. Understanding Conn. Gen. Stat. § 7-148 as a partial abrogation of governmental immunity makes clear why the legislature confined its scope to municipalities.

Additionally, Connecticut courts have interpreted the terms "town, city or borough" narrowly, excluding municipalities' administrative subdivisions from coverage. *See, e.g. Hall v. Gallo*, No. CV030476708S, 2004 WL 2896499, at *1 (Conn. Super. Ct. Nov. 5, 2004) (granting motion to strike the indemnification count as to the police department because "General Statutes § 7-465 is only applicable to a town, city or borough. An administrative subdivision of a town, such as a police department, is outside of the reach of the statute"); *Jackson-Colon v. Bridgeport Hous. Auth.*, 2007 Conn. Super. LEXIS 1169, *1-2 (Conn. Super. Ct. May 7, 2007) (" [Conn. Gen. Stat. §§ 7-465 and 52-557n] are clearly limited in scope in that they are applicable only to the types of parties enumerated within them.").

28

Accordingly, the Court dismisses Count Eight of the Amended Complaint without leave to amend.

E. **Plaintiff's "false report" claims against Mr. Abdullatff and vicariously against T&S United, LLC**

Finally, the Court considers Plaintiff's tort claim against Mr. Abdullatff and vicariously against T&S United, LLC arising from Mr. Abdullatff's false report that Mr. Witherspoon was attempting to rob the service station's customers with a gun. At issue is whether Connecticut law recognizes a cause of action for physical injuries inflicted on a bystander when police respond with excessive force to a false report of an armed suspect. Although the Amended Complaint is inartful insofar as it labels the cause of action upon which Plaintiff's seeks relief, the Court infers that she is pursuing a negligence, recklessness, or other tort claim. Based on the prevailing tort principles in Connecticut, the Court concludes that Plaintiff plausibly stated a claim for negligence against Mr. Abdullatff and vicariously against T&S United, LLC.

The Court will first address what reasonable inferences can be drawn from the facts alleged in the Amended Complaint. First, it is undisputed that Mr. Abdullatff placed the 911 call at issue. Second, Mr. Abdullatff conclusively reported that Mr. Witherspoon "...pulled a gun at the guy who delivered the paper here in Hamden its clear he was asking for money outside." [Am. Compl. ¶ 39]. He referred to Mr. Witherspoon as a "regular customer" and recognized Mr. Rodriguez as his newspaper deliveryman, which suggests that he had a clear view of their interactions. [*Id.*]. The Court also infers that Mr. Abdullatff's identity, or at least his

location, would have been known to police. These facts suggest that police would have taken Mr. Abdullatff's 911 call as serious and credible.  He conveyed a sense of urgency by reporting that Mr. Witherspoon was in the process of "harassing" another customer and that he was dangerous. [*Id*.]. He also asked for immediate assistance, which together with his other statements, suggested the second customer was in immediate jeopardy of being assaulted by Mr. Witherspoon. [*Id*.].

Plaintiff alleges that the gas station's video surveillance camera does not show Mr. Witherspoon attempting to rob Mr. Rodriguez with a gun. [Am. Compl. ¶ 42]. Plaintiff also alleges that Mr. Rodriguez later told state investigators that Mr. Witherspoon did not threaten him with a weapon. [Am. Compl. ¶ 43]. Based on these factual allegations, Plaintiff plausibly alleged that Mr. Abdullatff made a false police report and that he knew his report was false at the time he made it.[4]

Mr. Abdullatff also knew that an innocent bystander was a passenger in the vehicle when it left the service station. [*Id*.]. He reported the description of the vehicle, its license plate number, its occupants, and the direction it left from the gas station. As a consequence, there is a reasonable inference that an individual in Mr. Abdullatff's position would understand that police would respond to the 911 call urgently and would search the surrounding area for the vehicle. Since Mr.

---

[4] Plaintiff's opposition brief adds that Mr. Abdullatff later told law enforcement investigators that he never saw Mr. Witherspoon with a firearm and police never recovered evidence of a firearm in the vehicle. [Dkt. 55 (Pl. Mem. in Opp'n to T&S United Defs.) at 4]. These allegations were not included in the Amended Complaint and Plaintiff has not sought leave to amend the complaint to include them. As such, these allegations do not factor into the Court's consideration of whether Plaintiff plausibly stated a claim against the T&S United Defendants.

Abdullatf asked the police to come immediately to apprehend an armed and dangerous would-be robber, he should have foreseen that a police officer approaching Mr. Witherspoon would be prepared to use deadly force.

In support of their motion to dismiss, the T&S United Defendants argue that the Court should dismiss the Amended Complaint because: (1) Mr. Abdullatff's 911 call is a privileged petition to the government for relief, protected under the *Noerr-Pennington* doctrine, (2) Connecticut law does not recognize "false report" as a cause of action and Plaintiff fails to state an analogous claim for defamation, (3) the T&S United Defendants did not owe Ms. Washington a duty of care because the harm was not foreseeable, and (4) that Officers Eaton and Pollock's actions constitute an intervening superseding event. *See generally* [Dkt. 37 (T&S United Defs. Mot. to Dismiss)]. The Court will address each of the T&S United Defendants' arguments in turn.

a. The *Noerr-Pennington* doctrine and calls for police assistance

The *Noerr-Pennington* doctrine holds that attempts to influence legislative, executive, administrative, or judicial action are immune from liability by virtue of the First Amendment right to petition the government for a redress of grievances. *See Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510 (1972) ("Certainly the right to petition extends to all departments of the Government."). This is an important principle critical to the function of a democracy and presupposes good faith. The subversion of critical democratic principles is inimical to democracy. The immunity does not apply where "petitioning activity

ostensibly directed toward influencing governmental action, is a mere sham to cover ... an attempt" to violate federal law. *Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus.*, 508 U.S. 49, 56, 113 (1993) (internal quotations omitted). The Court need not address whether the "sham" exception applies because Mr. Abdullatff's 911 call is not a petition for government action for First Amendment purposes.

The T&S United Defendants cite *Graff v. O'Connell*, 2003 Conn. Super. LEXIS 2686 (Conn. Super. Ct. Sept. 29, 2003) for the proposition that the Connecticut Superior Court explicitly acknowledged that the *Noerr-Pennington* Doctrine covered phone calls to the police. [Dkt. 37 (T&S United Defs. Mem. in Supp.) at 9]. The Court agrees with Plaintiff that the facts of *Graff v. O'Connell* are distinguishable.

In *Graff*, the defendant-neighbors reported excessive barking and the operation of an illegal dog kennel to municipal code enforcement officials, animal control, and eventually to the state police. *Id.* at 2-3. The defendant-neighbors' nuisance complaints were justified, and the plaintiff paid a fine. *Id.* at 5. *Graff* did not involve an emergency or allegations that the defendant-neighbors' statement to authorities was knowingly false. On summary judgment, the Court interpreted the defendant-neighbors' complaints as petitioning municipal officials for regulatory enforcement action. *Id.* at 8-9 ("Application of the *Noerr-Pennington* doctrine to the situation in this case--*petitioning activity directed at local governments*--already is well established.") (emphasis added) (citing examples of political activity involving local government).

More recently and more analogous is the Superior Court's (Shortall, *J.*) opinion in *Shea v. Hoffman*, 2015 Conn. Super. LEXIS 2732, *11, 2015 WL 7421861, (Conn. Super. Ct. Oct. 29, 2015), which held that the *Noerr-Pennington* doctrine does not apply to emergency calls for police assistance. The Court agrees with the Superior Court's reasoning in *Shea*. There, a patient pursuing a medical malpractice claim alleged that her former doctor and his staff maliciously called the police when she returned to the office seeking medical information and falsely alleged that she threatened staff. *Id.* at 9. Citing to *Graff*, the court noted that it was the only case in Connecticut that has applied the doctrine to police calls for enforcement action. *Id.* at 10. The court considered *Graff*'s application of the doctrine "far-fetched," considering that "[t]here is no First Amendment right to call the police." *Id.* Instead, Connecticut law recognizes qualified immunity for statements made to police as a matter of tort law, which sufficiently balances the competing interests at issue. *See id.* (citing *Gallo v. Barile*, 284 Conn. 459, 462 (2007)).

The Court holds the *Noerr-Pennington* doctrine does not confer immunity against liability for knowingly making a false police report. The purpose of the doctrine in shielding political participation from civil liability would not be advanced by extending immunity in that circumstance. *Noerr*, 365 U.S. at 137 (". . . the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to

the Sherman Act a purpose to regulate, not business activity, but political activity…"). No legitimate public action could result from such an act.  On the contrary, police action always involves the potential for harm and initiating police action knowingly and unjustifiably is dangerous conduct which must be discouraged and not encouraged by a grant of immunity.

Granting immunity would also be inconsistent with state law.  Indeed, it is a crime in Connecticut to make a false police report. Conn. Gen. Stat. § 53a- 180c.[5] Thus, the legislature has made clear those who make false police reports should be held accountable, not shielded.

Dismissal based on the *Noerr-Pennington* doctrine is denied.

---

[5] Conn Gen. Stat. § 56a-180(c) provides that:

(a) A person is guilty of falsely reporting an incident in the second degree when, knowing the information reported, conveyed or circulated to be false or baseless, such person gratuitously reports to a law enforcement officer or agency (1) the alleged occurrence of an offense or incident which did not in fact occur, (2) an allegedly impending occurrence of an offense or incident which in fact is not about to occur, (3) false information relating to an actual offense or incident or to the alleged implication of some person therein, or (4) violates subdivision (1), (2) or (3) of this subsection with specific intent to falsely report another person or group of persons because of the actual or perceived race, religion, ethnicity, disability, sex, sexual orientation or gender identity or expression of such other person or group of persons.

(b) Falsely reporting an incident in the second degree is a (1) class A misdemeanor for a violation of subdivision (1), (2) or (3) of subsection (a) of this section, or (2) class E felony for a violation of subdivision (4) of subsection (a) of this section.

### b. Connecticut recognizes a qualified privilege for reports made to police

In *Gallo v. Barile*, the Connecticut Supreme Court expressly rejected the claim that statements to police are entitled to absolute immunity. 284 Conn. at 468. There, the Connecticut Supreme Court held that qualified immunity appropriately balances the countervailing public policy interests between encouraging the reporting of crimes with protecting victims from the consequences of false accusations. *Id.* at 471-78 (noting that a "qualified privilege is sufficiently protective of [those] wishing to report events concerning crime" and "[t]here is no benefit to society or the administration of justice in protecting those who make intentionally false and malicious defamatory statements to the police.") (quotations and citations omitted). Beyond harm to the victims of false allegations, the interests of the public are harmed when law enforcement resources are diverted to investigating false or malicious complaints. *Id.* at 477.

The Connecticut Supreme Court distinguished reporting criminal misconduct from civilian review complaints for police brutality, which are subject to absolute immunity. *Id.* at 474-75 (citing *Craigs v. Stafford Construction, Inc.*, 271 Conn. 78 (2004)). "[I]nformal reports of suspected criminal misconduct do not implicate the imbalance of power between citizens and governmental authorities and, therefore, do not involve our democratic values to the same degree as formal allegations of police abuse, brutality or other official wrongdoing." *Id.* at 475. Connecticut's qualified immunity rule represents the majority view among jurisdictions. *Id.* at 472-73 (surveying cases); *see also* 50 Am. Jur. 2d Libel and Slander § 276. This approach strikes a proper balance.

The T&S United Defendants' initial memorandum of law in support of their motion to dismiss does not address the applicability of qualified privilege. In opposition, Plaintiff identified the issue and argues that the privilege is defeated by Plaintiff's allegations that Mr. Abdullatff's statement was malicious. [Dkt. 55 (Pl. Mem. in Opp'n to T&S United Defs.) at 4-7]. The Court agrees with Plaintiff.

To overcome qualified privilege, Plaintiff must allege malice in fact or actual malice. *Gallo*, *supra*. 463, n. 6 (quoting *Hopkins v. O'Connor*, 282 Conn. 821, 845 (2007)). "Actual malice requires that the statement, when made, be made with actual knowledge that it was false or with reckless disregard of whether it was false.... A negligent misstatement of fact will not suffice; the evidence must demonstrate a purposeful avoidance of the truth...." *Id*. As stated previously, Plaintiff alleges facts tending to show that Mr. Abdullatf knew that his statement to police was false when he made it. He also indicated he was acquainted with Mr. Witherspoon.  All of this suggests Mr. Abdullatf may have made a knowingly false report in retaliation for an earlier encounter he had with Mr. Witherspoon.

It is also plausibly alleged that he acted recklessly based on racial animus, recklessly assuming Mr. Witherspoon was carrying a firearm because he was an African American male with dreadlocks. In sum, having alleged he admittedly made a false stereotypical police report, Ms. Washington has adequately alleged that Mr. Abdullatf acted with actual personal or racial malice, and if not recklessly.  See e.g., Christina Carrega, *'Because they can get away with it': Why African Americans are blamed for crimes they didn't commit: Experts African Americans make up 49% of wrongful convictions since 1989,* ABC News (May 31, 2020)

36

https://abcnews.go.com/US/african-americans-blamed-crimes-commit-experts/story?id=70906828; Rachel Scully, *Florida man planned to blame Black Lives Matter for ex-girlfriend's death*, The Hill (Jul. 13, 2021) https://thehill.com/homenews/state-watch/562693-florida-man-tried-to-blame-black-lives-matter-for-ex-girlfriends-death.

Contrary to the T&S United Defendants' position in their reply brief, Plaintiff is not required to prove an improper motive to overcome a claim of privilege. *Hopkins*, 282 Conn. at 845 ("We previously have held that the malice required to overcome a qualified privilege in defamation cases is malice in fact *or* actual malice.") (emphasis added). Therefore, even if Ms. Washington had failed to sufficiently allege ill-will or improper motive by Mr. Abdullatf that lacunae would not be dispositive to the qualified immunity issue.

c. Whether the T&S United Defendants owed Plaintiff a duty of care

The T&S United Defendants argue that they did not owe Plaintiff a duty of care because the necessary steps to cause the harm that she suffered were too far removed to be reasonably foreseeable. [Dkt. 37 (T&S United Defs. Mem. in Supp.) at 12-15]. In opposition, Ms. Washington argues that the general nature of the harm Plaintiff suffered, i.e. that police would fire upon her vehicle, was foreseeable, even if the precise and bizarre circumstances were not. The Court agrees with Plaintiff.

"Duty is a legal conclusion about relationships between individuals, made after the fact, and imperative to a negligence cause of action . . . The ultimate test of the existence of the duty to use care is found in the foreseeability that harm may

result if it is not exercised . . ." *Ruiz v. Victory Properties, LLC*, 315 Conn. 320, 328, (2015) (quotation and citation omitted).

The Court has no doubt that some people would label the specific circumstances of the shooting described in the complaint as incredulous. However, foreseeability concerns the general nature of the harm, rather than the specific way that the harm was sustained. *Id.* at 334-35; *Pisel v. Stamford Hosp.*, 180 Conn. 314, 332 (1980) (same). In other words, the dispositive issue concerns the level of inquiry and generalization. *Id.* In this context the question is whether a shooting incident could be foreseen, not whether the way the shooting occurred could be foreseen.

Incidents of officer involved shootings occur with disturbing regularity. At present, there are ten use of deadly force investigations pending with the State's Attorneys; 23 were completed since 2016. *See Reports on Use of Force by Police Officers*, Conn. Stat. Div. of Crim. Justice, https://portal.ct.gov/DCJ/Whats-News/Reports-on-the-Use-of-Force-by-Peace-Officers/Reports-on-the-Use-of-Force-By-Police-Officers#Completed (last reviewed on Aug. 2, 2021).

Plaintiff cites a journal article to support the proposition that police officers rely heavily on dispatched information when deciding whether to use deadly force. [Dkt. 55 (Pl. Mem. in Opp'n to T&S United Defs. Mot to Dismiss) at 13-14] (quoting Paul. L. Taylor, *Dispatch Priming and the Police Decision to Use Deadly Force*, 23 POLICE Q., 311-32 (Dec. 30, 2019). As a matter of common sense and experience, police officers are more likely to approach a suspect who is reported to be "armed

and dangerous" with their service weapons unholstered. Some of these encounters will end with police officers discharging their weapons, creating a foreseeable risk that a suspect or a bystander may be shot. The risk that officers would use deadly force in this case was amplified by the fact that the events occurred during the darkness of the early morning hours.

Applying these principles, the narrower issue of foreseeability concerns whether plaintiff alleged facts tending to show that a reasonable person in Mr. Abdullatff's position would know that a false report of an armed robber with a gun could result in police officers shooting at the suspect and their vehicle, thereby endangering the passenger that he knew was present. These conditions are present here.

This case is distinguishable from the principal case advanced by the T&S United Defendants, *Lodge v. Arett Sales Corp.*, 246 Conn. 563 (Conn. 1998). In *Lodge*, an alarm company negligently caused firefighters to respond to a false alarm. 246 Conn. at 563-70. While responding to the false alarm, the fire engine's breaks failed, causing a crash that killed two firefighters and injured others. *Id*. The breaks failed because the fire engine was negligently maintained and the issue of the faulty brakes was known among maintenance and firefighting personnel. *Id*. at 577-78. The Connecticut Supreme Court held that the risk of a crash by a negligently maintained and utilized fire engine was not reasonably foreseeable to the alarm company. *Id*. The court contrasted that situation with the ordinary risks that flow from negligent false alarms, such as injuries from collisions caused by the high-speed operation of fire engines on congested streets. *Id*.

The risk that a police officer responding to a report of an armed robbery might discharge their service pistol in response to a perceived threat (i.e. the suspect reaching for a possible weapon) is akin to a fire engine negligently striking a pedestrian while responding to a false alarm. Stated another way, "[h]ad the alarm been legitimate, the brake failure still would have occurred. No degree of care on the part of the defendants could have prevented the brake failure." *Id.* at 582-83. In contrast, here, Plaintiff alleged that Mr. Abdullatff's false allegation set the stage for the officers' use of deadly force because they approached the vehicle believing that he was armed. If Mr. Abdullatff never falsely reported the robbery and had not falsely reported that Mr. Witherspoon was armed, Officer Eaton may not have shot at Mr. Witherspoon when he complied with his command to vacate the vehicle. Had he not discharged his weapon, Officer Pollock may not have fired his weapon and the volley of shots which struck Ms. Washington four times may never have commenced.

Accordingly, the Court concludes that Plaintiff alleged that her injuries were a foreseeable result of Mr. Abdullatff's false 911 call. The T&S United Defendants have not contested the other element of duty.

d. <u>Whether Officer Eaton and Officer Pollock's actions constitute a supervening intervening cause as a matter of law</u>

The final issue is whether the actions of Officer Eaton and Officer Pollock constitute a supervening and intervening cause of Plaintiff's injuries.

In opposition, Plaintiff argues that the Connecticut Supreme Court no longer recognizes superseding tort jurisprudence except in cases involving an

40

intervening intentional tort, action of nature, or criminal event that was unforeseeable to the defendant. [Dkt. 55 (Pl. Mem. in Opp'n to T&S United's Defs.) at 11-12](citing *Snell v. Norwalk Yellow Cab, Inc.* 332 Conn. 720 (Conn. 2019) and *Barry v. Quality Steel Products, Inc.*, 263 Conn. 424 (2003)).

In reply, Plaintiff argues "[t]he actions of Eaton and Pollock (especially as alleged) are both intentional torts and criminal acts." [Dkt. 59 (T&S Defs. Repl. Br.) at 7]. Plaintiff has alleged a bevy of claims against individual, municipal, and private defendants based on different legal theories, including claims sounding in negligence. The Court takes judicial notice of the fact that there are pending state criminal charges against Officer Eaton related to the shooting. *State v. Eaton*, No NNH-CR-0224774-T. (Conn. Super. Ct. Oct. 21, 2019). There are no pending criminal charges against Officer Pollock. Nevertheless, whether any liability can be apportioned to the T&S United Defendants depends upon questions of fact and proof. Even if it is later established that its co-defendants committed an intentional tort or criminal event, apportionment depends upon the foreseeability of those events. *Snell*, 332 Conn. at 750.

For the aforementioned reasons, the Court DENIES the T&S United Defendants' Motion to Dismiss.

## Conclusion

To summarize, the Court GRANTS Dkt. 34, the Hamden Defendants' Motion to Dismiss. The Court dismisses the *Monell* claim against the Hamden Defendants, Count Twelve of the Amended Complaint, without prejudice. The Clerk is directed

to terminate the Hamden Police Department, Mayor Leng, and Acting Chief Sullivan from the case caption.

The Court GRANTS Dkt. 39, the New Haven Defendants Motion to Dismiss. The Court dismisses the *Monell* claim against the New Haven Defendants, Count Fourteen of the Amended Complaint, without prejudice. Plaintiff voluntarily moved to withdraw, and the Court dismisses Count Nine, the municipal indemnification claim. The Clerk shall terminate all of the New Haven Defendants from the case caption.

The Court GRANTS Dkt. 38, the Yale University Defendants' Motion to Dismiss. The Court dismisses the *Monell* claim against the Yale University Defendants, Count Thirteen of the Amended Complaint, without prejudice. The Court dismisses Count Eight for indemnification pursuant to Conn. Gen. Stat. § 7-465 without leave to amend. Count Seven of the Amended Complaint for respondeat superior under 42 U.S.C. § 1983 is also dismissed without leave to amend. Count Six of the Amended Complaint against Yale University for respondeat superior for Officer Pollock's alleged negligence remains pending. The Clerk shall terminate the Yale University Police Department and Chief of Police Ronnell Higgins from the case caption.

The Court DENIES Dkt. 37, the T&S United Defendants' Motion to Dismiss in its entirety.

To summarize, the following counts in the Amended Complaint remain pending:

- **Count One, Negligence as to Officer Eaton in his individual capacity;**
- **Count Two, Deprivation of Plaintiff's Fourth Amendment Rights pursuant to 42 U.S.C. § 1983 as to Officer Eaton in his individual capacity;**
- **Count Three, Indemnification pursuant to Conn. Gen. Stat. § 7-465 as to the Town of Hamden;**
- **Count Four, Negligence as to Officer Pollock in his individual capacity;**
- **Count Five, Deprivation of Plaintiff's Fourth Amendment Rights pursuant to 42 U.S.C. § 1983 as to Officer Pollock in his individual capacity;**
- **Count Six, Respondeat Superior as to Yale University for Officer Pollock's alleged negligence while acting in the scope of his duties as a university employee;**
- **Count Ten, "False Report" as to Mr. Abdullattf, which the Court implies to state a tort claim(s); and**
- **Count Eleven, Respondeat superior as to T&S United, LLC for Mr. Abdullattf's false statement while acting in the scope of his duties as the service station's employee.**

**Should Ms. Washington choose to amend her complaint, the Court grants leave to file an amended complaint within twenty-one (21) days of the date of this decision.**

**Finally, the Court continued the parties' requested Rule 16 scheduling conference during the pendency of these motions and Officer Eaton's pending criminal case. In light of the time which has elapsed and the objective of achieving a fair, efficient and timely adjudication of the case, the Court ORDERS the remaining parties to meet and confer. To the extend they have not already done so, the parties shall exchange their initial discovery disclosures within 30 days of this Order. The parties shall confer regarding the discovery that can be completed during the pendency of the criminal proceeding, respecting Officer Eaton's Fifth Amendment right against self-incrimination.**

**The Court will set a date for the scheduling conference in early October 2021. The parties should be prepared to engage in a comprehensive and meaningful case**

management discussion of the case at the conference, including the advisability of severing the claims against Officer Eaton.

The parties may collectively request a referral to a magistrate judge for a settlement conference prior to the scheduling conference if they feel that early settlement efforts would be productive.

IT IS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: August 2, 2021